**MISSOURI DEPARTMENT OF SOCIAL SERVICES, DIVISION OF MEDICAL SERVICES, Appellant,**

v.

**GREAT PLAINS HOSPITAL, INC., d/b/a Heartland Hospital, Respondent.**

**No. WD 51660.**

Missouri Court of Appeals, Western District.

July 16, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 27, 1996.

Application to Transfer Denied Oct. 22, 1996.

---

**3.** Unless otherwise noted, all statutory references are to RSMo 1994.

Kathleen Knepper, Missouri Department of Social Services, Jefferson City, Charles A. Miller, Caroline M. Brown, Covington & Burling, Washington, DC, for appellant.

Byron J. Gross, Jonathan P. Neustadter, Hooper, Lundy & Bookman, Los Angeles, CA, Thomas W. Rynard, Terry C. Allen, Craft, Fridkin & Rhyne, Jefferson City, for respondent.

Before SPINDEN, P.J., and BRECKENRIDGE and ELLIS, JJ.

ELLIS, Judge.

The Missouri Department of Social Services Division of Medical Services ("DMS") brings this appeal challenging an order entered by the Circuit Court of Cole County awarding injunctive and monetary relief to Great Plains Hospital Inc. d/b/a Heartland Hospital ("Heartland"). Adopting findings of the Administrative Hearing Commission

("AHC"), the circuit court found that a DMS cap on Medicaid reimbursement for psychiatric services violated procedural provisions of federal Medicaid law and the "reasonable cost" reimbursement provision of § 208.152.[1]

The Medicaid Act, 42 U.S.C. § 1396 *et seq.* (1992), authorizes federal grants to help states provide medical assistance to certain low-income individuals. Participation in the program is voluntary, but in exchange for federal funding, participating states must comply with the requirements imposed by the Act and with regulations promulgated by the Secretary of Health and Human Services. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990).

Each participating state is required to submit to the Health Care Financing Administration ("HCFA")[2] a "plan for medical assistance" comprehensively describing the nature and scope of that state's Medicaid program. *Id.*; *AMISUB (PSL), Inc. v. Colorado Dep't of Social Servs.,* 879 F.2d 789, 794 (10th Cir.1989), *cert. denied,* 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990) (citing 42 U.S.C. § 1396). Within this plan, the state is required to establish a scheme for reimbursing health care providers for the medical services they provide to Medicaid patients. *Wilder,* 496 U.S. at 499–502, 110 S.Ct. at 2513. The 1981 "Boren Amendment" to the Medicaid Act spells out this requirement:

A state plan for medical assistance must ... provide ... for payment ... of the hospital services ... through the use of rates ... which the state finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reason-

---

1. Unless otherwise noted, all statutory references are to RSMo 1994.

2. The HCFA is an agency within the federal Department of Health and Human Services des-

ignated by Congress to administer the Medicaid program at the federal level. *AMISUB (PSL), Inc. v. Colorado Dep't of Social Servs.,* 879 F.2d 789, 794 n. 9 (1989), *cert. denied,* 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).

able access ... to inpatient hospital services of adequate quality.

42 U.S.C. § 1396a(a)(13)(A)(1992).

Prior to January 1, 1990, health care providers within the Missouri Medicaid program received reimbursements from DMS based on a per-diem rate. The per-diem rate was calculated for each provider by dividing the provider's total allowable Medicaid inpatient costs by its total Medicaid inpatient days of stay. 13 C.S.R. 70–15.010(3). The per-diem rate was a "blended" rate because it reimbursed providers at the same rate regardless of the type of care rendered. For example, an acute care hospital providing both acute and psychiatric care was reimbursed at the same rate for both types of care even though acute care often has a higher cost than psychiatric care. The per-diem rate included an adjustment which increased the rate to account for inflation, a process referred to as "trending forward." 13 C.S.R. 70–15.010(1).

In 1990, in response to what it considered to be runaway growth in psychiatric care costs, DMS placed a ceiling or "cap" on the per diem reimbursement rates for certain inpatient psychiatric services.[3] Pursuant to 13 C.S.R. 70–15.010(15):

Effective for admissions beginning on or after January 1, 1990, certain psychiatric services will be reimbursed at the lower of the hospital's Title XIX per-diem rate or an inpatient psychiatric per diem of two hundred seventy-seven dollars ($277).... The inpatient psychiatric per diem is based on one hundred ten percent (110%) of the 1988 weighted average cost for instate, freestanding, nonstate-operated psychiatric units. The psychiatric rate will be adjusted by the inflation factor described in subsection (1)(F) granted on or after January 1, 1990.

The amount of the cap was determined by a DMS auditor who evaluated the psychiatric care costs reported by nine freestanding private psychiatric hospitals or psychiatric units

participating in the Missouri Medicaid program. The auditor examined each facility's Medicaid cost reports for fiscal year 1988 and calculated a weighted average per-diem cost of $252.05. Certain ancillary costs were omitted from the analysis and the resulting per-diem figure because the DMS "Provider Manual" indicated DMS did not reimburse for such services.[4] The auditor increased this average per-diem cost figure by an inflation trend factor of 10% established by DMS based on the Gross National Product Implicit Price Deflator. Using this methodology, DMS determined the per-diem cap on Medicaid reimbursement to be $277.00 per patient day. As a result, a provider would be paid at the lower of its blended per-diem rate or the cap rate for the covered psychiatric services it rendered.

Since its initial calculation, the psychiatric cap has increased as a result of a few modifying calculations. Effective July 1, 1990, DMS increased all per-diem rates, including the psychiatric cap, by a trend factor of one and one-half percent (1.5%),[5] raising the cap to $280.42 per patient day. In 1992, utilizing the same methodology as the original cap, the same DMS auditor rebased the psychiatric cap with each provider's reported Medicaid costs for fiscal year 1990. The auditor calculated the 1990 weighted average cost to have been $326.37 per patient day. The auditor then trended this figure forward to arrive at a total per-diem reimbursement cap of $344.66 per patient day, effective October 1, 1992.

On May 22, 1992, Heartland submitted a complaint to the AHC challenging the validity of the psychiatric reimbursement cap. The AHC held hearings on April 13, April 14, July 1, and July 2 of 1993. The commission issued its Findings of Fact and Conclusions of Law on July 7, 1994, making findings of fact but concluding it lacked the authority to declare a regulation invalid in order to grant Heartland relief. (The Commissioner cited to *State Tax Comm'n v. Administrative*

---

3. Only certain diagnosis codes are subject to the cap on per-diem reimbursement.

4. These excluded services included group therapy, individual therapy, occupational therapy, adjunctive therapy, speech pathology, psychological

testing, and most other psychiatric treatments other than hospitalization or electroshock.

5. DMS had initially requested a four or five percent increase from the legislature.

*Hearing Comm'n,* 641 S.W.2d 69 (Mo. banc 1982), for this proposition).

Both DMS and Heartland petitioned for review of the AHC decision in the Circuit Court of Cole County. On June 21, 1995, the circuit court issued an order adopting the AHC findings and invalidating the psychiatric cap. The circuit court ordered the state to pay Heartland the difference between what was actually paid and what would have been paid without the cap. DMS now challenges the decision of the circuit court.

■ In an administrative review case, the appellate court will review the decision of the Administrative Hearing Commission (AHC) rather than that of the circuit court. *City of Cabool v. Missouri State Bd. of Mediation,* 689 S.W.2d 51, 53 (Mo. banc 1985). "Generally, we are limited to determining whether the decision of the AHC is supported by substantial competent evidence based on the record as a whole, as well as whether it is arbitrary, capricious, or unreasonable, or whether there was an abuse of discretion by the Commission." *Southeast Missouri Hosp. Ass'n v. Missouri Dep't of Social* Servs., 886 S.W.2d 94, 97 (Mo.App. W.D.1994). However, where the pertinent facts are undisputed between the parties, as in the case at bar, this court will review the matter as a question of law. *Department of Social Servs. v. Our Lady of Mercy Home,* 803 S.W.2d 72, 75 (Mo.App. W.D.1990). Therefore, we give no deference to either the AHC's or the circuit court's conclusions of law; rather, this court will exercise its independent judgment and draw its own conclusions from the AHC's findings. *Southeast Missouri Hosp. Ass'n,* 886 S.W.2d at 97; *Gordon A. Gundaker Real Estate Co. v. Missouri Real Estate Comm'n,* 878 S.W.2d 466, 468–69 (Mo.App. E.D.1994); *St. Louis S. Park, Inc. v. Missouri Dep't of Social Servs.,* 857 S.W.2d 304, 306 (Mo.App. W.D.1993); *Our Lady of Mercy Home,* 803 S.W.2d at 75.

■ DMS's first four points attack the lower court's determinations that the psychiatric cap violated the procedural requirements of the Boren Amendment, that the cap

did not comply with federal requirements relating to disproportionate share hospitals, that the psychiatric cap failed to meet the "reasonable cost" standard required by Missouri statute, and that the cap was improperly calculated. We conclude DMS failed to comply with the procedural requirements of the Boren Amendment. As that decision is dispositive, we need not consider the other bases for the lower court's decision.[6]

■ In order to comply with the procedural requirements of the Boren Amendment, a state agency must engage in a two-step process. The state must first make "findings" that its reimbursement rates "are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." 42 C.F.R. § 447.253(b)(1)(1992). These findings must be made every time the state Medicaid agency "makes a change in its methods and standards, but not less than annually." 42 C.F.R. § 447.253(b)(1). After making these findings, the Medicaid agency "must make assurances" to HCFA that the state plan complies with the applicable federal laws and regulations. 42 C.F.R. § 447.253(a). These two requirements are separate obligations, and the findings requirement is a "necessary prerequisite" to the subsequent requirement that the state provide assurances. *Wilder,* 496 U.S. at 513 n. 11, 110 S.Ct. at 2519 n. 11.

■ The Boren Amendment requires the state "in making its findings, to judge the reasonableness of its rates against the objective benchmark of an 'efficiently and economically operated facility' providing care in compliance with federal and state standards while at the same time ensuring 'reasonable access' to eligible participants." *Wilder,* 496 U.S. at 519, 110 S.Ct. at 2523. Neither the Medicaid Act, the Secretary of Health and Human Services, or the Supreme Court have defined the terms "efficient" or "economical" nor do they require the states to do so. *Illinois Health Care Ass'n v. Bradley,* 983 F.2d 1460, 1464 (7th Cir.1993). "Given this

---

6. DMS also challenges the circuit court's award of monetary relief and the way in which those

damages were calculated. Those issues will be addressed, *infra.*

'definitional abyss,' there predictably has been 'considerable litigation' as to a state's obligations" with multiple jurisdictions establishing a variety of different standards. *Id.* (citations omitted).

In *AMISUB (PSL), Inc. v. Colorado Dep't of Social Servs.,* 879 F.2d 789 (10th Cir.1989), one of the oldest and most often cited Boren Amendment cases, the Tenth Circuit Court of Appeals invalidated a Colorado Medicaid plan which included a budget adjustment factor that decreased reimbursement by 46% to match the amount budgeted for Medicaid payments by the Colorado legislature. The Tenth Circuit found Colorado had based its decision solely on budgetary concerns and, therefore, had not complied with the findings requirement of the Boren Amendment. The court held:

> [t]he plain language of federal Medicaid law mandates the State Medicaid Agency, at a minimum, to make "findings" which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals.

*AMISUB,* 879 F.2d at 796. *AMISUB* further noted a state must articulate a rational connection between the facts found and the choice made. *Id.* at 800. The Tenth Circuit determined that because Colorado did not identify which hospitals were efficiently and economically run or the costs that must be incurred by those hospitals, Colorado had failed to meet the Boren Amendment findings requirement. *Id.* at 796.

While some courts have embraced *AMISUB,* others have stopped short of adopting its structured approach as a mandatory test. In *Illinois Health Care Association v. Bradley,* 983 F.2d 1460 (7th Cir.1993), the Seventh Circuit Court of Appeals rejected "the inference that a state must identify a reasonable sample of particular existing [health care facilities] as paradigms of efficiency." *Id.* at 1464–65. The court found that such a task

might be impossible, create controversy, and waste money better spent on patients. *Id.* at 1465. *Illinois Health Care* held "a state must determine in its own way what it would consider to be efficient and economic ... facilities and 'must make findings which establish a nexus between the costs of operating' those facilities and 'the proposed reimbursement rates under the state plan.'" *Id.* (quoting *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1314 (2nd Cir.1991)).

In *Temple University v. White,* 941 F.2d 201 (3rd Cir.1991), the Third Circuit Court of Appeals determined the plain language of 42 U.S.C. § 1396a required the state to make findings with regard to the three substantive requirements within that section. *Temple Univ.,* 941 F.2d at 210. Specifically, the court concluded the state must find "that (1) its rates take into account the circumstances of hospitals serving a disproportionate share of low-income patients; (2) its 'rates are reasonable and adequate to meet the necessary costs of an efficiently operated hospital;' and (3) its rates are reasonable and adequate 'to assure medicaid patients of reasonable access to inpatient hospital care.'" *Id.* (quoting *West Va. Univ. Hosp. v. Casey,*[7] 885 F.2d 11, 22 (3rd Cir.1989)). Similarly, the Eighth Circuit Court of Appeals has found state Medicaid agencies must conduct some sort of objective analysis or studies to determine the effects of a proposed reimbursement system on the level of care Medicaid patients would receive or the extent to which facilities would continue to participate in Medicaid. *Nebraska Health Care Ass'n v. Dunning,* 778 F.2d 1291, 1294 (8th Cir.1985).

DMS argues we should adopt the standard espoused in *Folden v. Washington State Department of Social and Health Services,* 981 F.2d 1054 (9th Cir.1992). *Folden* provides "states are free to create their own methods of arriving at the required findings." *Id.* at 1057. DMS claims the appropriate inquiry is whether "the state agency has considered, on the basis of a reasonably principled analysis, whether its payment rates meet the substantive requirements of the Boren Amendment."

---

**7.** *Casey* concluded the state must articulate a rational connection between the facts found and

the choice made. *Casey,* 885 F.2d at 28.

*Id.* DMS asserts that under this standard "it was not incumbent on DMS to determine the costs necessary to run an efficiently and economically operated facility" and that it "did not err in failing to specifically consider the factors relevant for determining such costs." DMS misinterprets the *Folden* standard. Even under this flexible standard, *Folden* would still require DMS to conduct a reasonably principled analysis and make all of the findings required by the Boren Amendment including a determination of the costs that must be incurred by efficiently and economically operated facilities. *Id.*

In the more recent case of *Abbeville General Hospital v. Ramsey*, 3 F.3d 797 (5th Cir.1993), the Fifth Circuit Court of Appeals noted that "[w]hether a court chooses to require a 'reasonably principled analysis' or a 'nexus' or a profile of efficiently and economically operated hospitals is not crucial to determining compliance with the findings requirement." *Id.* at 805. According to the court in *Abbeville*, all of this terminology simply addresses the question, "[W]hat is the minimum quantum of evidence that an agency must possess in its cognition to substantiate its assurances that the reimbursement rates in the Medicaid plan and any proposed amendments (1) reasonably and adequately meet the costs that must be incurred by efficiently and economically operated hospitals, (2) accommodate hospitals serving a disproportionate number of low income patients with special needs, and (3) adequately ensure that Medicaid recipients have reasonable access to inpatient hospital services of adequate quality?" *Id.* (citing 42 C.F.R. § 447.253(b)(1)(i), (ii)(A), (ii)(C)).

▮ "The findings requirement is not a mere formality that can be satisfied simply by having a state officer think a bit about hospital costs and then copy out the statutory language on a piece of paper, put the heading 'assurances' on that piece of paper, and send it to HCFA." [8] *Abbeville Gen.*

*Hosp.*, 3 F.3d at 805 (citing *Wilder*, 496 U.S. at 514–15, 110 S.Ct. at 2520). The state agency must show it conducted an objective analysis, evaluation, or some type of fact-finding process to determine the effects of the rates on the level of care Medicaid patients receive. *Nebraska Health Care Ass'n*, 778 F.2d at 1294; *Abbeville*, 3 F.3d at 805.

Where, as in the case at bar, the pertinent findings are not contested on appeal, we adopt the findings of the AHC and review the matter as a question of law to determine whether DMS made sufficient findings to satisfy the Boren Amendment. *See Our Lady of Mercy Home*, 803 S.W.2d at 75. The AHC found DMS analyzed "the growth of psychiatric costs by examining the population receiving services, the type of services they received, and the costs of those services." The DMS also looked at the reimbursement practices of private insurers.

DMS did not, however, determine which facilities in Missouri were "efficiently and economically operated" or the costs those facilities must incur to provide services in conformity with federal and state laws and regulations. The AHC found DMS "simply reasoned that an efficient and economically operated facility must incur less costs than facilities were actually incurring" for psychiatric services.

The AHC noted that the DMS auditor assigned to calculate the cap omitted the costs of group therapy, individual therapy, occupational therapy, adjunctive therapy, speech pathology, psychological testing, and most other psychiatric treatments other than hospitalization and electroshock when making his calculations. These exclusions were made pursuant to the DMS provider manual in which DMS unilaterally informs providers which services it considers reimbursable. Nothing in the record indicates appropriate findings were made to justify not reimburs-

---

8. Incidentally, the assurances sent to HCFA by DMS read in pertinent part as follows:

Inpatient hospital facility rates of payment have been found to be reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with the applicable State and Federal laws, regulations and quality and safety standards.

The methods and standards used to determine payment rates take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs.

ing hospitals for these services.[9] *See Illinois Health Care Ass'n,* 983 F.2d at 1466–67 (No sufficient findings to justify calculating reimbursement for nursing services where state Medicaid agency decided what services were to be included and how much time each service should take without supporting studies.).

DMS did not analyze whether certain factors, unrelated to economical and efficient operation, influenced the costs incurred by the surveyed facilities. Specifically, the DMS auditor did not consider the type of psychiatric services each facility predominately provided, the capital costs of each facility, or variations in labor costs among regions.[10]

DMS also failed to make findings annually or when it made trend factor changes to the cap as required by the Boren Amendment. When DMS adjusted the rate on July 1, 1990, it increased all Medicaid rates and the cap by a trend factor of one and one-half percent; no findings were made that hospital costs had increased only one and one-half percent over the fiscal year. In 1991 and 1992, DMS made no findings with regard to whether the rates under the psychiatric cap were reasonable and adequate to meet the costs that efficient and economical facilities must incur. Although the DMS applied trend factors to adjust acute care rates for these years, no trend factor was applied to adjust the psychiatric cap. The AHC found DMS had determined increases in the cap, the general plan, and other reimbursements based on the amount of money DMS had available to distribute in the overall Medicaid reimbursement package.

DMS alleges the lower tribunal erred in focusing on what the agency did not consider rather than on what it did consider. Examining the facts from this point of view, DMS

still fails to meet the findings requirement of the Boren Amendment. What the DMS did examine was a growing trend in the number of inpatient psychiatric cases, the types of services being rendered, an increase in the cost of these services, the historical costs of rendering these services, and the practices of private insurers reimbursing for psychiatric services. DMS then assumed hospitals were not efficiently and economically providing these services. The agency proceeded to establish a cap on the amount it would reimburse hospitals for their costs. This findings process mirrors the one found in *Abbeville.*

In *Abbeville,* the Louisiana state Medicaid agency assumed all state hospitals were economically and efficiently operated in 1981 and used the available cost reports for that base year to calculate target rates for each hospital. This target rate functioned as a cap for reimbursement. Hospitals that continued to remain under the target rate were considered efficiently and economically operated while those exceeding it were not. In determining the reasonableness of its reimbursement rates, the agency looked only at historical cost figures and general economic trends. The Second Circuit Court of Appeals found that nothing in the federal Medicaid scheme condones a findings procedure employing only historical cost data and projected inflation figures. *Abbeville,* 3 F.3d at 808–809. The agency had "reduced its findings process to a simple exercise of compilation and assumption, completely ignoring the Congressional mandate that state agencies consider relevant factors such as efficiency, economy, quality of care, and reasonable access." *Id.* at 808.

In the present case, DMS failed to adequately consider the questions mandated for findings by federal law and regulation. *Abbeville,* 3 F.3d at 805. DMS did not determine what costs must be incurred by efficient

---

9. No one in the department checked the auditor's work to determine whether he had included the correct facilities or whether he correctly calculated the average costs of those facilities. The AHC noted DMS erroneously included a facility which did not meet the established criteria resulting in a lower weighted average. The AHC also determined that the auditor erred in not including those services discounted by the DMS provider manual.

10. The AHC also found the psychiatric cap limited the ability of a hospital to recover funds as a disproportionate share provider. Hospitals providing exclusively psychiatric treatment were effectively denied part of their disproportionate share payments because of the cap.

and economical hospitals in order to comply with the applicable federal and state rules and regulations. 42 C.F.R. § 447.253(b)(1)(i).[11] Without this information, the state could not have reasonably found that its rates under the cap reasonably and adequately compensated efficiently and economically operated hospitals. *Illinois Health Care*, 983 F.2d at 1467.[12] In order to make this finding, DMS needed to "conduct an objective analysis, evaluation, or some kind of fact finding process to determine the effect of the rates on the level of care Medicaid patients receive and, as part of this process, compare its rates against the objective standard of an efficiently and economically operated institution." *Americare Properties, Inc. v. Whiteman*, 257 Kan. 30, 891 P.2d 336, 345 (1995) (citing *Abbeville*, 3 F.3d at 805). Instead, DMS simply assumed efficiently and economically operated hospitals would incur costs lower than the actual costs they had been incurring.[13] DMS also failed to adequately examine the potential effect of the cap on disproportionate share facilities and the cap's effect on Medicaid recipients' access to inpatient psychiatric services of adequate quality. 42 C.F.R. § 447.253(b)(1)(ii)(A), (ii)(C). DMS did not undertake any sort of objective analysis, evaluation, or fact-finding to determine the effects of the psychiatric reimbursement cap "on the level of care Medicaid patients would receive or the extent to which facilities would continue to partici-

pate in Medicaid." *Nebraska Health Care Ass'n*, 778 F.2d at 1294.[14] DMS argues there "has been no suggestion from any source that the cap has adversely impacted Medicaid patients." However, the actual effect the cap has had on Medicaid patients is not relevant to a determination of whether adequate findings were made on the issue.

DMS further argues it was generous in its approach to setting the cap because it accepted the cost reports of the hospitals as reported even though those reports had not been audited and may have included unnecessary elements. DMS also claims the affected hospitals, and specifically Heartland, were more than adequately compensated under the overall Medicaid scheme for the services they provided. However, both these arguments relate to substantive compliance with the Boren Amendment and are not relevant to a determination of whether the required findings were made prior to establishing the cap.

In light of the foregoing facts, we conclude DMS failed to meet the procedural requirements of the Boren Amendment in placing its cap on per diem psychiatric reimbursements. As a result, we must now examine whether the relief granted by the circuit court was appropriate.

█ After finding the psychiatric cap invalid, the circuit court determined that because the cap was void Heartland was entitled to be reimbursed the difference between

---

**11.** Nor did DMS determine which facilities were efficiently and economically operated, establish a model of such a facility, or even define what one would be.

**12.** In *Illinois Health Care Ass'n,* the state Medicaid agency set a reimbursement cap for nursing home support services at the 75th percentile. The Seventh Circuit Court of Appeals found the agency made no finding that a nexus existed between the chosen percentile and the costs of operating an efficient and economically operated hospital. *Illinois Health Care Ass'n,* 983 F.2d at 1467. The court held the failure of the state agency to determine what it would consider to be an efficiently and economically operated facility rendered it impossible for the agency to establish a nexus between the costs of operating such a facility and the agency's reimbursement rates. *Id.*

**13.** Using facilities' cost reports from 1988, the auditor calculated a weighted per diem cost of $252.05. After applying the ten percent trend

factor adjustment and the further one and one-half percent adjustment, DMS set the cap at $280.42 for the 1990 fiscal year. When the auditor rebased the cap in 1992 using cost reports from fiscal year 1990, he calculated a weighted average cost of $326.37 per patient day in 1990. While hindsight is not entirely appropriate in analyzing the DMS findings, it is interesting to note that the cap set for the 1990 fiscal year was $45.85 per patient day less than the auditor's later calculation of what the weighted average cost actually was in 1990. Given inflation rates that difference could only have risen in 1991 and 1992 when no trend factor was applied to adjust the cap.

**14.** In addition, DMS failed to make the required findings regarding the adequacy of reimbursement under the psychiatric cap for 1991 and 1992, nor did it make findings when making trend factor adjustments.

the amount it would have received without the cap and the amount it actually received. DMS contends the circuit court erred in awarding such monetary relief to Heartland.

DMS argues that before Heartland would be entitled to reimbursement for funds denied it by a procedurally invalid regulation, Heartland must show that DMS' rates under the invalid plan were substantively inadequate. DMS claims "at most, the court's conclusion, had it been correct, would have justified a procedural remedy, such as an order to the state to make proper findings." DMS cites no convincing authority for this proposition, and we reject its contention. We agree with Heartland and the circuit court that since the psychiatric cap was invalid, Heartland was entitled to be reimbursed pursuant to the previous unamended plan until such time as that plan is changed according to the applicable procedures. *See Avon Nursing Home v. Axelrod,* 83 N.Y.2d 977, 616 N.Y.S.2d 327, 329-30, 639 N.E.2d 1124, 1126–27 (1994) (following the invalidation of the state Medicaid reimbursement methodology by the Second Circuit Court of Appeals in *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306 (2nd Cir.1991), based on a procedural violation of the Boren Amendment, the state court ordered the state Medicaid agency to recalculate Medicaid reimbursement under the prior rate structure); *Volk v. Department of Human Resources,* 104 Or.App. 27, 799 P.2d 658, 664 (1990) ("[R]eimbursement must be made pursuant to the previous unamended plan."); *Americare Properties, Inc.,* 257 Kan. 30, 891 P.2d 336 (affirming trial court decision that reimbursement was appropriate under unamended plan where agency committed procedural violation of Boren Amendment in enacting new reimbursement plan); *New England Memorial Hosp. v. Rate Setting Comm'n,* 394 Mass. 296, 475 N.E.2d 740, 745 (1985) ("Where no effective new rate has been established, the old rate remains in effect.").

DMS next continues to make substantive compliance arguments by arguing that when payments to Heartland from other state programs are considered (i.e. UCACI, FRA, and MMCP), Heartland received enough money to cover any deficiency caused by the psychi-

atric cap. We find those payments are irrelevant to the case at bar. Heartland was entitled to reimbursement for their Medicaid services under a validly promulgated plan. The court below merely dictated that DMS reimburse Heartland according to its last, validly enacted payment plan.

■ For its final argument, DMS contends that some of Heartland's claims were time barred. This point is without merit. Heartland filed its complaint with the AHC on May 22, 1992. DMS argues the thirty day limitations period of § 208.156.8 should act to bar Heartland from receiving relief for any loss accruing before July 1, 1992, the date the rebased cap went into effect. Both the AHC and the circuit court concluded the § 208.156.8 limitation period did not apply in cases challenging the validity of regulations.

■ Statutory construction is a question of law, not fact, and where the lower court rules on a question of law, it is not a matter of discretion. *State ex rel. Igoe v. Bradford,* 611 S.W.2d 343, 350 (Mo.App. W.D.1980). The judgment of the trial court is afforded no deference when the law has been erroneously declared or applied. *Id.* When construing statutes, courts must endeavor to ascertain the intent of the legislature from the language used and, if possible, give effect to that intent. *Magee v. Blue Ridge Professional Bldg.,* 821 S.W.2d 839, 843 (Mo. banc 1991). Legislative intent should be determined by considering the plain and ordinary meaning of the terms in the statute. *Maudlin v. Lang,* 867 S.W.2d 514, 517 (Mo. banc 1993). Each word, clause, sentence, and section of a statute should be given meaning. *State ex rel. Missouri Bd. of Registration for Healing Arts v. Southworth,* 704 S.W.2d 219, 225 (Mo. banc 1986).

Section 208.156.4 grants the right of administrative review before the AHC to any Medicaid provider who "is aggrieved by any rule or regulation promulgated by the department of social services or any division therein." § 208.156.4. Subsection 5 further grants the right of administrative review to any provider "who is aggrieved by any rule or regulation, contractual agreement, **or decision,** as provided for in section 208.166." § 208.156.5 (emphasis added). Subsection 8,

relied on by DMS, states that providers "shall have thirty days from the date of mailing or delivery of a decision of the department of social services ... in which to file [its] petition for review with the administrative hearing commission...." § 208.156.8. Giving meaning to each term of this section, subsection 5 clearly differentiates department "decisions" from department "regulations." As the time limitation of subsection 8 applies only to departmental "decisions," that provision does not apply to Heartland's challenge to a regulation under § 208.156.4. Point denied.

For the reasons set forth above, the judgment of the circuit court is affirmed.

All concur.

---

1. Unless otherwise noted, all statutory references are to RSMo 1994.