MIDWEST DIVISION–OPRMC, LLC d/b/a Overland Park Regional Medical Center and Midwest Division–MMC, LCC d/b/a Menorah Medical Center, Appellants–Respondents,

v.

DEPARTMENT OF SOCIAL SERVICES, DIVISION OF MEDICAL SERVICES, Respondents–Appellants.

Nos. WD 67544, WD 67633.

Missouri Court of Appeals, Western District.

Dec. 18, 2007.

 
 

Richard Donald Watters, St. Louis, Terry C. Allen, Jefferson City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gary Lee Gardner, Office of Atty. Gen., Jefferson City, for Respondent.

RONALD R. HOLLIGER, Judge.

Two Kansas hospitals ("Hospitals") and the Missouri Department of Social Services ("DSS"), appeal a trial court judgment finding that DSS illegally paid Hospitals less than Missouri hospitals for the same services provided Missouri Medicaid recipients. The trial court awarded Hospitals damages for the underpayments for five years but held that damages for the previous years were barred by the statute of limitations. Hospitals appeal the amount of the damages award and the denial of prejudgment interest. DSS cross-appeals the determination of its liability for any damages to Hospitals. We determine that Hospitals and DSS had a valid agreement for reimbursement and that DSS failed to properly calculate reimbursements to Hospitals for the services they provided. We also determine that the trial court improperly limited Hospitals' damages based on the five-year statute of limitations and improperly denied prejudgment interest. The judgment is, therefore, affirmed in part and reversed in part.

## I. The Stipulated Facts

The case was submitted to the trial court without a jury on a Joint Stipulation of Facts. Following is a summary of the parties' stipulation.

Hospitals are both located in Kansas, near the Missouri border, and provide services to Missouri Medicaid beneficiaries. Pursuant to Chapter 208, Hospitals each had an agreement with DSS[1] to provide inpatient services to Missouri Medicaid beneficiaries. Hospitals completed the "Missouri Medicaid Provider Questionnaire" and signed the "Title XIX Participation Agreement for Inpatient/Outpatient Hospital Services" ("Provider Agreements"). The Provider Agreements were submitted to DSS as a condition of participation in the Missouri Medicaid Program. The Provider Agreements signed by Hospitals state:

I agree the Missouri Title XIX Medicaid manual, bulletins, rules, regulations and amendments thereto shall govern and control my delivery of service, and further agree to the following terms: ... The rate of reimbursement for services

---

**1.** The Department of Social Services ("DSS") includes the Division of Medical Services, which is responsible for administering the Medicaid program.

will be based on charges established and determined by the Division of Medical Services Medicaid manual, bulletins, and amendments thereto in accordance with the Vendor Payment Program ...

The parties agreed that the listed sources, including the Medicaid manual, bulletins, and amendments, do not specify reimbursement rates. Regulations promulgated by DSS, however, set forth the rates and the methodology for determining reimbursement. These regulations are authorized by section 208.152,[2] which provides:

Benefit payments for medical assistance shall be made on behalf of those eligible needy persons who are unable to provide for it in whole or in part, with any payments to be made on the basis of the *reasonable cost of the care or reasonable charge for the services* as defined and determined by the division of medical services ...

Section 208.152.1 (emphasis added).

With the authority granted by Chapter 208, DSS issued rules and regulations defining allowable and reasonable costs for health care providers as well as the proper method of reimbursement. "Reasonable cost" of inpatient hospital services is defined as "an individual hospital's Medicaid per diem cost per day as determined in accordance with the general plan rate calculation from section (3) of this regulation using the base year cost report." 13 CSR 70–15.010(2)(O) (former version at 13 CSR 70–15.010(2)(M)). Between April 1, 1994, and October 30, 2004, only in-state hospitals were reimbursed their "reasonable cost" for services. During this time, the regulations provided a different method of reimbursement for out-of-state hospitals. Pursuant to 13 CSR 70–15.010(3), in-state

hospitals were paid per diem rates based on their own cost of providing services, plus Medicaid add-ons. *See* 13 CSR 70–15.010(1)(C). Hospitals located outside of Missouri were paid the lower of: (1) the charges they billed for services, or (2) $345.13 per diem for adults aged twenty-one years or older and $660.89 per diem for children under twenty-one years of age (Out–of–State Cap Rate). 13 CSR 70–15.010(14)(A) (repealed by 13 CSR 70–15.190). These Out–of–State Cap Rates were based on outdated weighted averages for Missouri hospitals. The Out–of–State Cap Rate for adults equaled the 1986 Missouri rate, with some adjustment for inflation, while the Out–of–State Cap Rate for children reflected the October 1993 rate. In-state reimbursement rates were adjusted yearly for inflation, but out-of-state hospital rates never were. If Overland Park Regional had been paid using the same methodology applied to Missouri hospitals during fiscal years 1994 through 2004, it would have been reimbursed an additional $1,307,856.95. Menorah would have received an additional $782,705.15.

## II. Procedural Background

The sequence of events surrounding the attack on this alleged discriminatory treatment of out-of-state hospitals and the ultimate withdrawal by DSS of the regulation on which it was based is arguably important to some of the issues so it is set forth in detail herein. In their petition filed June 9, 2004, Hospitals sought a declaratory judgment, injunction, and damages, alleging that the Out–of–State Cap Rate conflicted with section 208.152, and violated the Equal Protection Clause, the Commerce Clause, and other federal law. The

---

2. All statutory references are to Missouri Revised Statutes, 2000, unless otherwise indicated.

same circuit court had found in a 2003 case involving other hospitals that the Out–of–State Cap Rate violated the provision in section 208.152.1 requiring that service providers be reimbursed the "reasonable cost of the care or reasonable charge for the services." *See Univ. of Kan. Hosp. Auth. v. Dep't of Soc. Servs.*, No. 01–CV325584. DSS did not appeal that ruling. Sixteen days after this suit was filed, the Cole County Circuit Court again found the Out–of–State Cap Rate invalid. *See Blessing Hosp. v. Dep't of Soc. Servs.*, No. 03–CV3242295. Again DSS did not appeal but rescinded the invalid regulation on October 30, 2004, and adopted a new regulation, 13 CSR 70–15.190(3). From July 1, 2004, until the new regulation was enacted, DSS reimbursed Hospitals at a rate similar to that of in-state hospitals.

After repeal of the offensive regulation, DSS filed a motion to dismiss Hospitals' claim for declaratory judgment arguing that it was barred by sovereign immunity and was moot because the regulation that it sought to have interpreted and declared invalid was no longer in force. In an order dated December 6, 2004, the trial court found that Hospitals' claims for declaratory and injunctive relief were moot since the Out–of–State Cap Rate had been repealed and replaced. Among its findings, the court also held that although sovereign immunity generally protected the state from suit, that immunity was waived for contractual causes of action and proceedings brought before the Administrative Hearing Commission ("AHC") under section 208.156. The court granted DSS's motion to dismiss, and gave Hospitals leave to file an amended petition, recognizing that they might have a claim for breach of contract.

On January 4, 2005, Hospitals filed their amended petition "to declare and construe the terms of a Medicaid provider agreement" and to seek damages for breach of contract. In their petition, Hospitals asked the court: (1) to declare the invalid Out–of–State Cap Rate to be an unenforceable term of the Provider Agreements, (2) to construe the Provider Agreements as requiring DSS to reimburse Hospitals for their reasonable costs, (3) to declare DSS to be in breach of the Provider Agreements, and (4) to determine the proper reimbursement rate between April 1, 1994, and October 30, 2004, and to award damages amounting to the difference between that figure and what they were paid under the Out–of–State Cap Rate, plus interest.

The court entered its judgment on August 29, 2006, concluding that the Provider Agreements were valid contracts and that DSS breached them when it reimbursed Hospitals under the invalid Out–of–State Cap Rate. Since the Provider Agreements did not contain payment terms, and the invalid Out–of–State Cap Rate could not be given effect as a contract term, the court found that the valid regulation determining reimbursement rates for in-state hospitals, at 13 CSR 70–15.010(3), became part of the parties' contracts. The court awarded damages limited by the five-year statute of limitations in section 516.120.1, from June 9, 1999, through June 30, 2004. Thus, Overland Park Regional was awarded $912,699.26 and Menorah was awarded $640,956.58. Hospitals were denied prejudgment interest. Both parties appeal the judgment.

## III. Standard of Review

The standard of review in a court-tried case is governed by *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). However, review of a case submitted on stipulated facts is articulated in *Schroeder v. Horack,* 592 S.W.2d 742, 744 (Mo. banc 1979). Thus, the only question before this court is whether the trial court drew the

proper legal conclusions from the stipulated facts. *Id.* Even when reviewing stipulated facts, "we 'must accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence.'" *Gen. Motors Acceptance Corp. v. Windsor Group, Inc.,* 103 S.W.3d 794, 796 (Mo.App. E.D.2003) (quoting *Sachs Elec. Co. v. HS Constr. Co.,* 86 S.W.3d 445, 453 (Mo.App. E.D.2002)). Questions of law are reviewed *de novo. Smith v. Shaw,* 159 S.W.3d 830, 832 (Mo. banc 2005).

## IV. Discussion

### A. DSS's Cross–Appeal

Because Hospitals only complain of the damages determination on their appeal we first address the cross-appeal by DSS claiming that the trial court erred in entering a judgment against it for liability. For logical consistency, we will first address DSS's second point on appeal that Provider Agreements were not contracts and that the trial court erred in so finding and determining that any contract existed between DSS and Hospitals that was breached. In its first point on appeal, DSS contends that Hospitals failed to exhaust their administrative remedies before the AHC and alternatively that Hospitals' claims are barred by laches, estoppel or accord and satisfaction.

### 1. Hospitals and DSS Had a Contractual Relationship

Preliminarily, there is some debate between the parties as to whether the Hospitals' action is one for declaratory judgment or breach of contract. Under the heading "Nature of Petition," the Hospitals characterized their amended petition, as "an action to declare and construe the terms of a Medicaid provider agreement between Plaintiffs and Defendant, and to seek damages from Defendant for breach of that contract."

■ Missouri's Declaratory Judgment Act provides that "[any] person ... whose rights, status or other legal relations are affected by a ... contract ... may have determined any question of construction or validity arising under the ... contract ... and obtain a declaration of rights, status or other legal relations thereunder." Section 527.020. Section 527.030 provides that "A contract may be construed either before or after there has been a breach thereof." Section 527.080 authorizes further relief to be granted "whenever necessary and proper." As an illustration of how section 527.080 is applied, the Court, in *Hudson v. Jones,* held that "if the obligations of the defendants under the contract ... be found as claimed in the petition, the court could, ... [determine] ... the issue of the damge [sic] to the plaintiffs by the breaches, if any, and the amount thereof, and any other issues of fact necessary to complete relief." *Hudson v. Jones,* 278 S.W.2d 799, 804 (Mo.App.1955). Section 527.120 provides that "This law is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered." Determining the sufficiency of a petition for declaratory relief "hinges on whether the parties show entitlement to a declaration of rights or status on the pleaded facts." *Lake Ozark Constr. Indus., Inc. v. North Port Assocs.,* 859 S.W.2d 710, 714 (Mo.App. W.D.1993). Whether the instant action is classified as one for declaratory judgment or for breach of contract, Hospitals will be entitled to damages if we determine that Provider Agreements are contracts and that DSS breached them.

■ DSS's second point on appeal claims that the trial court erred in finding the Provider Agreements were contracts.

DSS argues that: (1) provider reimbursement is governed by statutes and regulations, not by contract, (2) no provision of the Provider Agreements is allegedly breached, (3) Provider Agreements do not contain payment provisions, (4) Provider Agreements are not negotiated between the parties, but are merely enrollment forms to participate in the Medicaid program.

To support its contention that Provider Agreements are not contracts, DSS cites several cases from foreign jurisdictions and one Missouri Supreme Court opinion, none of which are applicable. In *NME Hospitals, Inc. v. Department of Social Services*, 850 S.W.2d 71, 74 (Mo. banc 1993) (*"NME 1993"*), the Missouri Supreme Court held that an agency policy in a Medicaid Bulletin issued by DSS could not be given effect as a contract term where not adopted in a formal rule and in conflict with a statute.[3]

The *NME 1993* Court was never asked to rule directly on the issue of whether Provider Agreements were contracts. For the sake of deciding the case, the Court accepted the argument that they were contracts, but held that they could not be amended in a way that violated the Missouri Administrative Procedure Act's requirement that an agency statement of general applicability be adopted only by rule making. *Id.* (citing *Missourians for Separation of Church & State v. Robertson*, 592 S.W.2d 825, 841 (Mo.App. W.D. 1979)).

The Court in *NME 1993* also cited an Illinois case, which DSS likewise uses to support its argument that Provider Agreements are not contracts. The *NME 1993* Court described the Illinois holding this way: "state agencies may not evade rule-

making by contract." *Id.* at 75 (citing *Senn Park Nursing Ctr. v. Miller*, 104 Ill.2d 169, 83 Ill.Dec. 609, 470 N.E.2d 1029 (1984)). DSS misstates the holding of both *NME 1993* and *Senn Park*; neither stands for the proposition that Provider Agreements are not contracts but only that alleged contracts cannot be inconsistent with a statute.

The cases DSS cites from other jurisdictions are equally inapplicable. In *Samissa Anchorage, Inc. v. Department of Health & Social Services*, 57 P.3d 676 (Alaska 2002), the Alaska Supreme Court decided that a hospital was not entitled to prejudgment interest because the claim for under-reimbursement was brought as an appeal from an administrative decision, not as a contract claim, and so the state was entitled to sovereign immunity. *Id.* at 680–81. But that decision was made based upon the court's understanding of Alaska's administrative code. The court even stated, "we need not decide whether North Star and the department had a contract." *Id.* at 680 n. 23.

DSS cites a Second Circuit case that also fails to support its contention. That case involved application of New York civil procedure law to determine which statute of limitations applied to Medicaid reimbursement claims. *Hollander v. Brezenoff*, 787 F.2d 834, 837–38 (2d Cir.1986). The *Hollander* Court stated, "We recognize that provider agreements may achieve a status of their own as contracts, but appellant does not claim that any specific obligation undertaken in these agreements was breached." *Id.* at 838. The Provider Agreements at issue in that case "contain[ed] no substantive reimbursement provisions" and did not contain "language

---

**3.** Interestingly, but of no legal consequence, it was DSS that argued in *NME* that the Provid-

er Agreements were contracts.

relating to reimbursement rights." *Id.* Although Second Circuit opinions are not binding on this Court, the case is nonetheless distinguishable.

In the instant case, the Provider Agreements do specifically refer to reimbursement rights when they state: "The rate of reimbursement for services will be based on charges established and determined by the Division of Medical Services Medicaid manual, bulletins, and amendments thereto in accordance with the Vendor Payment Program." The requirement, pursuant to section 208.156.1, that hospitals be paid the "reasonable cost" (as currently defined at 13 CSR 70–15.010(2)(O)) of the care provided is precisely the obligation that Hospitals allege was breached. Paragraph thirteen of Hospitals' amended petition states, "The Out-of-State Cap Rate paid by Defendant between April 1, 1994 and October 30, 2004 did not reimburse Plaintiffs for the reasonable cost of the care they provided to Missouri Medicaid beneficiaries."

### a. Even if Provider Agreements are "Mere Enrollment Forms," They Can Still be Considered Contracts

■ DSS's next contention that the Provider Agreements are not contracts because they "are not negotiated between the parties and are merely enrollment forms" is also without merit. Not all contracts are negotiated between parties. In fact, "the bulk of contracts signed in this country are form contracts—'a natural concomitant of our mass production-mass consumer society.'" *Whitney v. Alltel Comm'ns, Inc.*, 173 S.W.3d 300, 310 (Mo. App. W.D.2005) (quoting *Hartland Computer Leasing Corp.*, 770 S.W.2d 525, 527 (Mo.App. E.D.1989)). "'Adhesion contracts usually involve the unequal bargaining power of a large corporation versus an individual and are often presented in pre-

printed form contracts.'" *Id.* (quoting *Swain v. Auto Servs., Inc.*, 128 S.W.3d 103, 107 (Mo.App. E.D.2003)). Missouri courts do not "view adhesion contracts as inherently sinister and automatically unenforceable." *Hartland*, 770 S.W.2d at 527. "Rather, as with all contracts, the courts seek to enforce the reasonable expectations of the parties garnered not only from the words of a standardized form imposed by its proponent, but from the totality of the circumstances surrounding the transaction." *Id.* By arguing that Provider Agreements are forms, which are not negotiated between parties, DSS is actually arguing that they are contracts of adhesion.

### Provider Agreements are Contracts that Incorporate by Reference Regulations Defining "Reasonable Cost"

■ When construing an agreement, the "cardinal principle ... is to ascertain the intention of the parties and to give effect to that intent." *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. banc 1995). Courts must consider the document as a whole and give effect to the plain, ordinary, and usual meaning of a contract's words. *Jackson County v. McClain Enters., Inc.*, 190 S.W.3d 633, 640 (Mo.App. W.D.2006).

Here, the Provider Agreements state that Hospitals will participate in the "Vendor Payment Plan for Inpatient/Outpatient Hospital Services" and that "the Missouri Title XIX Medicaid manual, bulletins, *rules, regulations,* and amendments thereto shall govern and control [their] delivery of service." (Emphasis added.) The next eight paragraphs in the Provider Agreement define the relationship between DSS and the signatory regarding service provision and "payment," "billing," "claims," and "reimbursement." Hospitals provided

medical services to Missouri Medicaid beneficiaries pursuant to this agreement.

■■■ The paragraph at issue, Paragraph two, states that the "the rate of reimbursement for services will be based on charges established and determined by the Division of Medical Services." Yet, the listed documents, "Medicaid manual, bulletins, and amendments thereto" do not mention the rate of reimbursement. In fact, since the Missouri Supreme Court decided *NME 1993*, it is questionable whether those documents could legally contain reimbursement rates. In its brief, DSS states that there are no payment terms in the Provider Agreements and that the agreements do not refer to any regulation that governs payment of services. However, in reading the Provider Agreements as a whole to ascertain the parties' intent, the plain language states that DSS is to determine the rate of reimbursement for services. DSS either could not or did not publish the reimbursement rates in the "Medicaid manual, bulletins, and amendments thereto," but it did publish rates in its rules and regulations. Those rules and regulations are referred to and incorporated within the Provider Agreements as part of what "govern[s] and control[s]" the providers' "delivery of service." In Missouri, "matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in haec verba." *Jim Carlson Constr., Inc. v. Bailey,* 769 S.W.2d 480, 481 (Mo.App. W.D.1989). If no meaning were given to Paragraph two, the Provider Agreements would contain no method of payment for service providers. Courts prefer to give meaning to all of an agreement's provisions rather than leaving a portion of the writing useless and inexplicable. *Martin v. U.S. Fid. & Guar. Co.,* 996 S.W.2d 506, 511 (Mo. banc 1999).

Thus, as the trial court concluded, DSS's "valid regulations relating to reimbursement of providers of medical services to Missouri Medicaid beneficiaries and adopted pursuant to and in compliance with the statutory authority of Chapter 208 become part of these contracts." Since the Out-of-State Cap Rate cannot be given effect as a valid contract term, DSS's regulation at 13 CSR 70–15.010(3), regarding reimbursement rates for in-state hospitals, supplied the terms of payment. *Mo. Dep't of Soc. Servs. v. Great Plains Hosp., Inc.,* 930 S.W.2d 429, 438 (Mo.App. W.D.1996). DSS breached the contracts by paying Hospitals under the invalid Out-of-State Cap Rate and not their reasonable costs as required by law. Therefore, Hospitals are entitled, unless barred by some affirmative defense to be considered next, to the difference between the amount they received under the invalid regulation and what they would have received if they had been paid their reasonable costs. *See id.* (collecting cases). Point denied.

### 2. Hospitals are not Required to Exhaust Administrative Remedies

DSS contends that Hospitals' claims are barred by their failure to exhaust administrative remedies. It cites the proposition that " 'where a remedy before an administrative agency is provided, relief must be sought by exhausting this remedy before the courts will act.' " *State ex rel. Oakwood Manor Nursing Ctr. v. Stangler,* 809 S.W.2d 90, 92 (Mo.App. W.D.1991) (quoting *Sperry Corp. v. Wiles,* 695 S.W.2d 471, 472 (Mo. banc 1985)). DSS claims that Hospitals were required to file their petition before the AHC since section 208.156.4 states that service providers "authorized under section 208.153 to provide services for which benefit payments are authorized under section 208.152 who is aggrieved by any rule or regulation pro-

mulgated by the department of social services or any division therein" are entitled to a hearing before the AHC. Section 208.156.4.

Each party cites a different case to support its argument about whether the AHC had jurisdiction over Hospitals' claims. DSS cites *Great Plains,* 930 S.W.2d at 438, for the proposition that the AHC had exclusive jurisdiction to hear Hospitals' claims. In *Great Plains,* a hospital challenged the validity of a regulation capping the per diem reimbursement rate for psychiatric services. *Id.* at 431. Great Plains Hospital brought its claim before the AHC pursuant to section 208.156.4. *Id.* at 431, 438. The AHC issued findings and, citing a Supreme Court case, determined that it did not have authority to invalidate a regulation. *Id.* at 433 (Commissioner cited to *State Tax Comm'n v. Admin. Hearing Comm'n,* 641 S.W.2d 69 (Mo. banc 1982), for this proposition). Both parties petitioned the Cole County Circuit Court for review of the decision. *Id.* at 433. The circuit court adopted the AHC findings, determined the cap to be invalid, and ordered DSS to pay Great Plains the difference between what they were actually paid and what they would have been paid without the cap. *Id.* at 433, 437–38. The Court ordered the reimbursement to be made pursuant to the last validly enacted plan. *Id.* at 438. Among its holdings, the circuit court found that the cap violated the "reasonable cost" provision of section 208.152. *Id.* at 431. This Court affirmed the circuit court's decision. *Id.* at 439. DSS now argues that *Great Plains* is applicable to the case at bar. DSS believes that, since the Out–of–State Cap Rate was in effect at the time Hospitals filed their

claim, the AHC had jurisdiction, requiring exhaustion of that remedy.

Hospitals argue that this case is actually more analogous to *Missouri Department of Social Services v. NME Hospital, Inc.,* 11 S.W.3d 776 (Mo.App. W.D.1999) (*"NME 1999"*). NME Hospital filed a claim with the AHC seeking reimbursement following the determination in *Great Plains* that the psychiatric cap was invalid. *Id.* at 779. In *NME 1993,* the invalid regulation had already been withdrawn by DSS before the hospital's suit was filed.[4] *Id.* at 781. This Court found that section 208.156.4 did not confer jurisdiction to the AHC because the subsection applied only when "a person is presently injured by an existing rule." *Id.* This Court reversed the AHC finding that the hospital was entitled to Medicaid reimbursement. *Id.* at 778. Hospitals cite *NME 1999* as authority for the theory that the AHC did not have jurisdiction over the claim and that, therefore, exhaustion was not required.

Neither case is directly on point since Hospitals filed their original petition seeking declaratory judgment while the Out–of–State Cap Rate was still being enforced and then filed an amended petition after DSS withdrew the invalid regulation. While *Great Plains* and *NME 1999* appear to be similar to the instant case at first glance, neither involved an exhaustion of remedies defense, since both actions originated with the AHC. Here, by contrast, Hospitals' original petition was an action for declaratory judgment pursuant to section 536.050.1, which provides an exception to the exhaustion requirement.

 While the exhaustion doctrine is well-settled law, "an exception . . . is found in Section 536.050.1." *Mo. Health Care*

---

4. Here, the invalid regulation was withdrawn *after* suit was filed but *before* the amended petition.

*Ass'n v. Mo. Dep't of Soc. Servs.*, 851 S.W.2d 567, 569 (Mo.App. W.D.1993) (distinguishing between an agency *rule* and an agency *decision* for purposes of applying the exhaustion doctrine). "If an action involves an agency rule, the exhaustion of administrative remedies does not apply." *Id.* In the instant case, Hospitals filed an action for declaratory judgment regarding application of a rule. Section 527.010 gives circuit courts the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Section 527.010. Section 536.050 extends this power to "declaratory judgments respecting the validity of rules, or of threatened applications thereof, and such suits may be maintained against agencies whether or not the plaintiff has first requested the agency to pass upon the question presented." Section 536.050.1. Therefore, the AHC did not have exclusive jurisdiction to hear Hospitals' claims and the original petition was properly before the circuit court.

While Hospitals' original petition seeking declaratory judgment was within the jurisdiction of the circuit court, DSS argues that the claims within the amended petition need to be exhausted since they fall under section 208.156.4. The circuit court dismissed the original petition, declaring it moot since DSS had already withdrawn the regulation at issue. The circuit court then gave Hospitals leave to file an amended petition. Once DSS withdrew the Out–of–State Cap Rate, the AHC no longer had jurisdiction to hear claims regarding a regulation that had been withdrawn. *See NME 1999*, 11 S.W.3d at 781. If the AHC no longer had jurisdiction, there was no longer an administrative remedy available and, therefore, there was no exhaustion requirement.

Exhaustion is generally required as a matter of preventing premature interference with the agency processes, so that the agency may function efficiently and so that it may correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Boot Heel Nursing Ctr., Inc. v. Mo. Dep't of Soc. Servs.*, 826 S.W.2d 14, 16 (Mo.App. W.D.1992). No policy goals would be served by requiring Hospitals to exhaust a claim for which an administrative remedy no longer exists. This is particularly true where, as here, the state agency has removed the necessity for the administrative remedy and taken the matter out of the AHC's jurisdiction.

### 3. Hospitals' Claims were not Barred by Laches, Estoppel or Accord and Satisfaction

 DSS next alleges that Hospitals' claims are barred by laches. "Invocation of laches requires that a party *with knowledge of the facts giving rise to his rights* delays assertion of them for an excessive time and the other party suffers legal detriment therefrom." *Rich v. Class*, 643 S.W.2d 872, 876–77 (Mo.App. E.D. 1982) (emphasis added). The doctrine of laches does not require a person to assert a claim within a fixed period of time. *Lake Dev. Enters., Inc. v. Kojetinsky*, 410 S.W.2d 361, 368 (Mo.App.1966). "Laches cannot be invoked to defeat justice." *Id.* Here, Hospitals filed their action seeking declaratory judgment on June 9, 2004, after the Out–of–State Cap Rate was found to be invalid in 2003 and 2004. Waiting one year from a court's declaration that the regulation governing their Medicaid reimbursement was illegal is not undue delay. It would defeat justice to bar Hospitals from recovering payments rightfully owed them.

■ To support its argument that Hospitals should be estopped from asserting their claim for under-reimbursement, DSS cites: "A party may be estopped from questioning the existence, validity and effect of a contract by accepting the benefits of that contract." *Netco, Inc. v. Dunn,* 194 S.W.3d 353, 360 (Mo. banc 2006). DSS neglects, however, to include the second half of the paragraph it cites, stating the policy reason behind the rule, that a party " 'should not be allowed to assume the inconsistent position of affirming a contract in part by accepting or claiming its benefits, and disaffirming it in part by repudiating or avoiding its obligations, or burdens.' " *Id.* (quoting *Dubail v. Med. W. Bldg. Corp.,* 372 S.W.2d 128, 132 (Mo. 1963)). DSS's reliance on the doctrine of estoppel is misplaced. Here, it is not Hospitals that are avoiding their obligations; they have already performed their duties by providing medical services to Missouri's Medicaid beneficiaries. It is DSS that is seeking to avoid its obligation to pay Hospitals the reasonable cost for their services.

■ Accord and satisfaction is, likewise, not a viable affirmative defense for DSS. An "accord and satisfaction" involves " 'an agreement between parties to give and accept something different from that claimed by virtue of the original obligation and both the giving and acceptance are essential elements.' " *Damon Pursell Constr. Co. v. Mo. Highway & Transp. Comm'n,* 192 S.W.3d 461, 475 (Mo.App. W.D.2006) (quoting *Interstate Petroleum Distribs., Ltd. v. F & B Invs., Inc.,* 816 S.W.2d 263, 269 n. 5 (Mo.App. S.D.1991)). Here, there was no agreement between the parties that DSS give and Hospitals accept something other than the "reasonable cost of the care or reasonable charge for the services" as required by section 208.152, and as currently defined at 13 CSR 70–15.010(2)(O). Therefore, Hospitals' claims are not barred by failure to exhaust, laches, estoppel or accord and satisfaction. Point denied.

That portion of the judgment finding DSS liable for reimbursement to Hospitals is affirmed.

### B. Hospitals' Appeal

### 1. Hospitals' Claim Should be Limited by the 10–year Statute of Limitations

■ Hospitals' first point on appeal claims that the trial court should have awarded damages for the entire time they were paid under the invalid Out–of–State Cap Rate. In the alternative, they argue that the ten-year statute of limitations rather than the five-year statute should have limited damages.

In claiming that damages should not be limited by any statute of limitations, Hospitals cite *Great Plains.* In *Great Plains,* the hospital was awarded damages covering the entire amount of time that DSS enforced the invalid regulation. *Great Plains,* 930 S.W.2d at 438. However, that case never discussed a statute of limitations, nor was it necessary since the hospital was only seeking reimbursement for fiscal years 1990, 1991, and 1992. *See Alexian Bros. of St. Louis, Inc. v. Dep't of Soc. Servs.,* 18 S.W.3d 534, 536 (Mo.App. W.D.2000). Besides, the claim in *Great Plains* was originally filed with the AHC, and such claims are subject to different time limits from the statutes of limitations applied to claims brought in circuit court.

The trial court in this case limited damages to the five-year statute, which applies to "[a]ll actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110." Section 516.120.1. The ten-year statute of limitations applies to "[a]n action upon any

writing ... for the payment of money or property." Section 516.110.1.

The ten-year statute applies to the case at bar. Overturning nearly a century of case law distinguishing between the five-year and ten-year statute of limitations, the Supreme Court has held that the ten-year statute of limitations applies to every breach of contract action in which the plaintiff seeks a judgment from the defendant for payment of money the defendant agreed to pay in a written contract. *Hughes Dev. Co. v. Omega Realty Co.*, 951 S.W.2d 615, 617 (Mo. banc 1997). The Court no longer limits the ten-year statute to financial instruments. *Id.* The Court stated that although this interpretation was "admittedly quite broad," it was nonetheless adopted. *Id.*

Therefore, Hospitals shall be awarded damages incurred between June 9, 1994, and June 9, 2004 (the date this action was filed), and between June 9, 2004, and June 30, 2004 (the last date DSS paid Hospitals pursuant to the Out–of–State Cap Rate).

### 2. Hospitals are Entitled to Prejudgment Interest

Hospitals' second claim is that they should have received prejudgment interest on their damages. " 'Interest' is the measure of damages for failure to pay money when payment is due even though the obligor refuses payment because the obligor questions legal liability for all or portions of the claim." *Miller v. Gammon & Sons, Inc.*, 67 S.W.3d 613, 624 (Mo.App. W.D.2001) (quoting *J.R. Waymire Co. v. Antares Corp.*, 975 S.W.2d 243, 248 (Mo. App. W.D.1998)). When parties have not previously agreed on a specific interest rate, section 408.020 applies. *Id.* Section 408.020 states that "[c]reditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after

they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made." Section 408.020.

Prejudgment interest will be awarded when a claim is liquidated. *Miller*, 67 S.W.3d at 624. A claim is liquidated when the amount is " 'fixed and determined or readily ascertainable by computation or a recognized standard.' " *Id.* (quoting *J.R. Waymire Co.*, 975 S.W.2d at 248). Interest will be allowed from the time of demand. *Chouteau Auto Mart, Inc. v. First Bank of Mo.*, 148 S.W.3d 17, 27 (Mo.App. W.D.2004). If no demand is made, the date the lawsuit was filed will be the substitute. *Id.*

Hospitals' damages were calculated by applying the "per diem reimbursement rate computation" formula defined in the former regulation at 13 CSR 70–15.010(3) that was used to pay Missouri hospitals. The amount Hospitals were paid under the Out–of–State Cap Rate was subtracted from that calculation to arrive at the total damage award. DSS's regulation specifically defines all terms in the formula used to calculate the "reasonable cost" required by the former 13 CSR 70–15.010(2)(M). Because Hospitals' damages are "readily ascertainable by computation or a recognized standard," they are liquidated. *Miller*, 67 S.W.3d at 624 (quoting *J.R. Waymire Co.*, 975 S.W.2d at 248). Hospitals are, therefore, entitled to prejudgment interest.

### V. Conclusion

For the reasons discussed above, the trial court's conclusion that Hospitals' claim was not barred by failure to exhaust, laches, estoppel, or accord and satisfaction is affirmed. The court's declaration that Provider Agreements were enforceable contracts, which were breached by DSS, is also affirmed. The trial court's application

of the five-year statute of limitations and its denial of prejudgment interest are reversed. This case is remanded with directions that the judgment be modified to apply the ten-year statute of limitations and include prejudgment interest on the award from the date the original petition was filed, June 9, 2004.

THOMAS H. NEWTON, Presiding Judge, and JAMES M. SMART, JR., Judge, concur.