**AGI–BLOOMFIELD CONVALESCENT CENTER, INC., d/b/a Bloomfield Convalescent Center, et al., Respondents,**

v.

**Barrett A. TOAN, Director, Department of Social Services, et al., Appellants.**

**No. WD 34194.**

Missouri Court of Appeals,
Western District.

July 24, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Oct. 2, 1984.

Application to Transfer Denied
Nov. 20, 1984.

Larry L. Kendrick, Dept. of Social Services, Div. of Gen. Counsel, Jefferson City, for appellants.

Harvey M. Tettlebaum, Jefferson City, for respondents.

Before SOMERVILLE, P.J., and CLARK and LOWENSTEIN, JJ.

SOMERVILLE, Presiding Judge.

Plaintiffs, some twenty-three (23) separate corporate entities operating nursing homes in the State of Missouri (hereinafter collectively referred to as respondent nursing homes), filed an action for declaratory judgment and injunctive relief in the Circuit Court of Cole County respecting the validity and enforcement of certain provisions of 13 CSR 40–81.081,[1] captioned "Prospective Reimbursement Plan for Long-Term Care". The aforementioned carried an effective date of October 1, 1981, and was promulgated by the Department of Social Services, State of Missouri, which is mandated by state law to administer the Medicaid program in Missouri. The follow-

ing were named as defendants: Department of Social Services; Barrett A. Toan, Director, Department of Social Services; Division of Family Services, Department of Social Services; and James R. Moody, Director, and Gretchen Engquist, Deputy Director, Division of Family Services, Department of Social Services (hereinafter collectively referred to as appellants).

The homes operated by respondent nursing homes are leased facilities—twenty-two (22) by "assignment" of existing leases by lessee-assignors and one (1) by lease from an owner-lessor.[2] Respondent nursing homes, in addition to rental payments assumed, paid various amounts, described as "lease acquisition costs", to the lessee-assignors for "assignment" of the leases. Each of respondent nursing homes' predecessors (in the context of facility) were participating in the Medicaid program and had established Medicaid per diem reimbursement rates. All of the facilities operated by respondent nursing homes are managed by an independent management company on a fee basis of seven (7) percent of the annual gross revenues of respondent nursing homes. The lease acquisition mechanism has become increasingly prevalent in recent years in the nursing home industry resulting in higher costs for patient care without any commensurate increase in quality or quantity of care.

On or about March 1, 1982, the twenty-three corporate plaintiffs filed requests with the Division of Family Services, Department of Social Services, for establishment of increased Medicaid per diem reimbursement rates on the asserted ground that each was a "new provider". At this juncture it is pertinent to note 13 CSR 40–81.081(4)(B): "In the case of new providers or newly constructed facilities entering the Missouri Medicaid program after July 1, 1981 and for which no rate has previously been set, the director or his designee may set an initial rate for such facili-

---

**1.** Amendments to 13 CSR 40–81.081 subsequent to the date of the judgment and decree entered in this case are not involved.

**2.** All occurring after October 1, 1981, and before March 1, 1982.

ty as in his discretion he deems appropriate. Such initial rate shall be subject to review by the advisory committee under the provisions of section (7) of this regulation." The higher rates sought reflected, among other things, substantial increases for recovery of capital costs attributable to "lease acquisition costs". Respondent nursing homes do not contend that any "newly constructed facilities" are involved.

The Department of Social Services, by a series of correspondence, duly advised respondent nursing homes that they were not eligible for the increased rates sought as leasing of the nursing home facilities did not constitute a "change of ownership" as defined in 13 CSR 40–81.081(3)(L), nor were plaintiffs "new providers" as defined in 13 CSR 40–81.081(3)(M). The term "change of ownership" is defined as follows in 13 CSR 40–81.081(3)(L): "Change of Ownership. Where the fee title to the real estate and the building and fixtures, which building is or has been operated as a facility providing long-term twenty-four (24)-hour care is transferred and recorded, except when the transition is between related parties." The term "new providers" is defined as follows in 13 CSR 40–81.081(3)(M): "New Providers. Facility or operator owning or operating a facility which was not participating in the Missouri Medicaid program on July 1, 1981." On the basis of the premises just mentioned, the Department of Social Services advised respondent nursing homes that each, respectively, would be reimbursed at the Medicaid per diem reimbursement rates in effect for their predecessor lessee-assignors or lessor.

Respondent nursing homes expressed their collective displeasure at rejection of their requests for the establishment of new Medicaid per diem reimbursement rates by filing the instant lawsuit seeking a declaratory judgment that 13 CSR 40–81.081(3)(L), defining "change of ownership", and 13 CSR 40–81.081(3)(M), defining "new providers", promulgated by the Department of Social Services, were beyond its statutory authority and, hence, "improper, void and unenforceable". By way of companion relief, respondent nursing homes prayed for a mandatory injunction, in the event the declaratory relief sought was granted, ordering appellants to set new Medicaid per diem reimbursement rates, respectively, for respondent nursing homes.

Cutting through a maze of interim procedural events, e.g. certain show cause and interlocutory orders, the trial court ultimately rendered judgment wherein it declared, "as a matter of law", that respondent nursing homes, and each of them, were "new providers" under 13 CSR 40–81.081. The trial court explicated its reasons for doing so as follows in the final judgment entered:

"a. Plaintiffs and each of them were not participating in the Medicaid (Title XIX) Program on July 1, 1981.

b. Under 13 CSR 40–81.081(3)(F) a 'provider' is a 'facility with a valid participation agreement'.

c. Only a corporate or individual person (or persons) has the ability to enter into a 'valid' participation agreement.

d. Under 13 CSR 40–81.081(3)(L) an operator who was not participating in the Missouri Medicaid program on July 1, 1981, is a new provider, even though a prior provider operating a facility may have been in the program on that date."

Consistent with its declaration that respondent nursing homes were "new providers" under 13 CSR 40–81.081, the trial court decreed that appellants set new Medicaid per diem reimbursement rates for respondent nursing homes, and, in conjunction therewith, the trial court set forth guidelines to be followed by appellants in doing so, one of which would enable respondent nursing homes to recapture "lease acquisition" costs.

Three significant observations are appropriate at this juncture. First, the trial court, in its final judgment and decree, specifically held that *"[p]laintiffs' argument that 13 CSR 40–81.081(3)(F), (L) and (M) are beyond the scope of the statute* giving authority to defendants to promulgate rules and are therefore improper, void and unenforceable *is rejected."* (emphasis

added) Second, the trial court, neither directly nor by innuendo, suggested or implied that the definition of "change of ownership" in 13 CSR 40–81.081(3)(L), or the definition of "new providers" in 13 CSR 40–81.081(3)(M), were equivocal or fraught with ambiguity. Third, respondent nursing homes have never contended, and the trial court did not purport to find or hold, that §§ 208.152.1 and 208.159, RSMo Supp.1983, statutorily authorizing the Department of Social Services to promulgate rules for administering the Medicaid program, were so vague as to constitute an unlawful delegation of legislative authority to the Department of Social Services. In view of the aforementioned, the trial court's declaration that respondent nursing homes were "new providers" under 13 CSR 40–81.081, supra, thereby rejecting appellants' definition of "new providers", is difficult to correlate with any recognized legal principle.

The genesis of this litigation is some rather sweeping changes in the Medicaid area of social legislation. The Medicaid program, enacted as Title XIX of the Social Security Act, 42 U.S.C. § 1396, et seq., provides, inter alia, for federal and state sharing of payments for nursing home services provided to certain qualified individuals.

The program is a classic example of what may be aptly referred to as cooperative federalism. The federal government provides matching funds to participating states which, subject to compliance with certain federal requirements, locally administer their own programs and transmit payments to providers of nursing home services. By reason of Medicaid's scope and magnitude, dual (federal and state) legislative and administrative involvement, and frequent amendments to accommodate changes of direction in social experimentation, cases involving rules and regulations promulgated by participating states for administering their respective programs literally abound with what appear, at first blush, to be intimidating legal questions. However, when reduced to basics and put in proper perspective, such questions lose their aura of intimidation. The instant case is no exception.

Prior to October 1, 1981, the plan promulgated by the Department of Social Services for determining reimbursement rates for nursing home services in Missouri under the Medicaid program could appropriately be described as a *retrospective reimbursement plan*. In essence, an estimated patient per diem reimbursement rate was established for each participating nursing home at the beginning of the state fiscal year and payments were made to participating homes on that basis. At the end of the fiscal year costs were reported by the participating homes to the Department of Social Services and the respective patient per diem rates were adjusted retroactively to reflect all allowable costs incurred throughout the preceding year, subject only to certain determinable limits. Additionally, a mechanism was provided for homes to obtain interim rate increases each quarter during the fiscal year. Missouri's retrospective reimbursement plan was correlated with 42 U.S.C. § 1396a(a)(13)(E) (amended in 1980) requiring nursing home providers to be reimbursed on a "reasonable cost related basis." The retrospective reimbursement plan to which Missouri geared its Medicaid program prior to October 1, 1981, was patently a cost-pass-through plan essentially devoid of any incentive for cost containment measures which might either free funds for improved services for needy recipients or reduce the combined federal and state tax burden underwriting the program.

In 1980 the "reasonable cost related" standard, 42 U.S.C. § 1396a(a)(13)(E), supra, was reexamined at the federal level by reason of a continuing escalation of costs attendant reimbursement to nursing homes participating in state Medicaid programs. Congressional displeasure was expressed by adoption of the Boren Amendment which deleted the "reasonable cost related" standard for reimbursement. In lieu thereof the Boren Amendment gave participating states greater flexibility in implementing cost-effective measures by specifying that nursing homes be reimbursed at rates

that a *state* finds, and provides assurance to the Department of Health and Human Services, "are reasonable and adequate to meet the costs which *must be incurred by efficiently and economically operated facilities* in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards...."[3] Omnibus Reconciliation Act of 1980, § 962, amending § 1396a(a)(13)(E), 94 Stat. 2599, 2650–51 (1980). (emphasis added) Section 1396a(a)(13)(E) was later redesignated and is hereinafter cited as 42 U.S.C. § 1396a(a)(13)(A). Concomitantly, §§ 208.152.1 and 208.159, supra, come into play and command attention.

Section 208.152.1, supra, provides, among other things, that payments to nursing homes participating in the Medicaid program are "... to be made on the basis of the reasonable cost of the care or reasonable charge for the services as defined and determined by the division of family services...." Section 208.159, supra, provides, insofar as here pertinent, that "[n]otwithstanding the provision of section ... 208.152 ... the department of social services shall administer payments for nursing home services authorized in sections 208.151, et seq., which govern medical assistance under Title XIX, Public Law 89–97, 1965 amendments to the Federal Social Security Act ... as amended, ... [and] [t]he department shall, pursuant to chapter 536, RSMo, promulgate rules and regulations for the purpose of administering such payments, including rules to define the reasonable costs, manner, extent, quality, charges and fees or payments for nursing home services."

It is difficult to imagine a broader, less restrictive grant of administrative authority than that authorized by 42 U.S.C. § 1396a(a)(13)(A), supra, and §§ 208.152.1 and 208.159, supra, exercise of which finally culminates in the Department of Social Services in this state. Perhaps there is no viable alternative due to the massive overlapping ramifications of the social program in question. Under the auspices of the foregoing statutory provisions, federal and state, the Department of Social Services promulgated 13 CSR 40–81.081, supra, certain provisions of which are the eye around which the instant legal storm swirls. Departing from the prior *retrospective* reimbursement plan, 13 CSR 40–81.081 effective October 1, 1981, initiated a *prospective* reimbursement plan. More particularly, the Medicaid per diem reimbursement rate for nursing homes that were participating in the Medicaid program on June 30, 1981, was based on "the facility's per diem reimbursement rate in effect on June 30th of the preceding state fiscal year" multiplied by a "negotiated trend factor" to account for inflation since that time. 13 CSR 40–81.081(4)(A)1.A. Under the *prospective* reimbursement plan, reconsideration of a "facility's per diem reimbursement rate in effect on June 30th of the preceding state fiscal year" is limited to certain well delineated situations—(a) changes in the level of care by a facility, (b) changes in "case mix", (c) the age of the cost report upon which a June 30, 1981, rate was established, (d) unusual labor market conditions, and (e) "significant and extraordinary circumstances." 13 CSR 40–81.081(7)(B)1. Provisions are also made for rate reconsideration where a nursing home facility undergoes a "change of ownership" (as defined) or new construction has occurred, 13 CSR 40–81.081(7)(B)2, and for the setting of initial Medicaid per diem reimbursement rates by the "director or his designee", subject to revision by the advisory committee for "new providers" and for "newly constructed" facilities entering the Missouri Medicaid program after July 1, 1981, and for which no rate had previously been set. 13 CSR 40–81.081(4)(B), supra.

Under the *prospective* reimbursement plan, failure of a nursing home facility to qualify as either a "change of ownership", a "new provider" or a "newly constructed"

---

**3.** The Boren Amendment did "not require States to rely exclusively on provider cost data in determining rates ... [o]ther independent measures of what services ought to cost could be used." Comments of Senator Boren, 126 Cong. Rec., S5826 (daily ed., June 30, 1980).

facility entering the program after July 1, 1981, precluded establishment of a new Medicaid per diem reimbursement rate and committed such a nursing home facility to the reimbursement rate in effect for the provider operating such facility on June 30th of the preceding state fiscal year.

Appellants, after being given the benefit of considerable doubt, appear to posit their right to appellate relief on two grounds: (1) the judgment and decree rendered by the trial court cannot stand because the Department of Social Services did not exceed its statutory authority in promulgating 13 CSR 40–81.081, more particularly the definitions of "change of ownership" and "new providers" contained therein, nor were the aforementioned arbitrary or unreasonable; and (2) in the event respondent nursing homes are found on appeal to be "new providers" under 13 CSR 40–81.081, the trial court exceeded its authority in mandatorily prescribing guidelines to be followed by appellants in establishing new Medicaid per diem reimbursement rates for respondent nursing homes.

■ Respondent nursing homes remind this court, and appellants do not take issue therewith, that appellate review of the judgment and decree of the trial court is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)—a judgment or decree in a court-tried case will not be disturbed on appeal unless it is unsupported by substantial evidence, or is against the weight of the evidence, or erroneously declares or erroneously applies the law.

*Foremost-McKesson, Inc. v. Davis*, 488 S.W.2d 193, 197–98 (Mo. banc 1972), contains an exhaustive compilation of established principles for testing the validity of administrative regulations:

"Appellants in seeking to overturn administrative rules and regulations bear a heavy burden, as we said in *King v. Priest* (banc), 357 Mo. 68, 206 S.W.2d 547, 552: 'In view of the broad authority granted respondents by statute, supra, and the admitted adoption of the rule pursuant thereto, the rule must be regarded as prima facie reasonable ... The burden rested upon appellants to plead facts to show the invalidity of the rule ... Only in a clear case will the courts interfere on the ground of unreasonableness ... '

Rules and regulations are to be sustained unless unreasonable and plainly inconsistent with the act, and they are not to be overruled except for weighty reasons. *Commissioner of Internal Revenue v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695 [698], 92 L.Ed. 831; *King v. Priest*, supra. The burden is upon those challenging the rules to show that they bear no reasonable relationship to the legislative objective. *King v. Priest*, supra; *Ketring v. Sturges* (Mo.Sup.), 372 S.W.2d 104. The interpretation and construction of a statute by an agency charged with its administration is entitled to great weight. *Federal Trade Commission v. Mandel Brothers, Inc.*, 359 U.S. 385, 391, 79 S.Ct. 818 [823], 3 L.Ed.2d 893; *Ketring v. Sturges*, supra; *State ex rel. Curators v. Neill* (Mo.Sup.), 397 S.W.2d 666, 670. Administrative rules should be reviewed in light of the evil they seek to cure and are not unreasonable merely because they are burdensome. *Borden Company v. Thomason* [353 S.W.2d 735] supra."

Judicial restraint is a constant requisite when application of the above-mentioned principles is called for in a given case. The administrative process, notwithstanding its seeming incompatibility at times with the legislative and judicial processes, is, nevertheless, an integral part of our legal system. Courts must exercise constant vigilance to avoid unwarranted intrusions into areas peculiarly within the administrative domain by either knowingly or inadvertently substituting their judgment and philosophy for that of administrative bodies statutorily charged with carrying out established public policies. Recognition and preservation of the legitimate bounds of administrative authority must prevail in judicial quarters if the administrative process

is to fulfill its unique function in our legal system. See generally: *Walling v. Benson*, 137 F.2d 501, 504 (8th Cir.1943); *American Health Care Association, Inc. v. Califano*, 443 F.Supp. 612, 615 (D.D.C. 1977); and *California Medical Association v. Brian*, 30 Cal.App.3d 637, 642, 106 Cal.Rptr. 555, 558 (Cal.App.1973).

Application of the controlling principles heretofore enunciated ordains reversal of the judgment and decree entered by the trial court. The narrow definitions given "change of ownership" and "new providers" in 13 CSR 40–81.081(3)(L) and (M) reflect appellants concern and a responsible reaction to the spiraling costs of the Medicaid program attributable to change of operators by the lease assignment mechanism. "Change of ownership" was narrowly defined in terms of transferring title in *fee* to nursing home facilities in order to distinguish a change in operators under a lease arrangement. By the same token, "new providers" was narrowly defined in terms excluding both *facilities* and *operators owning and operating facilities* which were "not participating in the Missouri Medicaid program on July 1, 1981." The narrow definitions given both "change of ownership" and "new providers" were obviously directed toward controlling pyramiding costs in the Medicaid program occasioned by lessee operators of facilities seeking establishment of new Medicaid per diem reimbursement rates reflecting lease acquisition costs with no additional or improved services contemplated for needy patients. The characterization, "pyramiding costs", is eminently appropriate as evidenced by an inevitable increase in costs, without any corresponding increase in the quality or quantity of services, by stacking the specious cost factor of lease acquisition costs on top of rental payments which have already been factored in as capital costs in a lessee-assignor's Medicaid per diem reimbursement rate.

■ Proliferating Medicaid per diem reimbursement rates in no way commensurate with or related to the quality or quantity of nursing home services being ren-

dered, but, to the contrary, occasioned by the lease mechanism (either by direct leases or assignment of existing leases), was a matter of legitimate concern for appellants. They viewed the problem as approaching crisis proportions and responded in a manner consistent with both their statutory authority and a sense of fiscal responsibility.

An array of arguments marshalled by respondent nursing homes to uphold the judgment and decree of the trial court appear to fall in one or the other of three general categories, and the same will be discussed on that basis.

■ One argument advanced by respondent nursing homes rests on the contention that the "Boren Amendment" standard of reimbursement is inapplicable and does not bear on the subject due to the fact that § 208.152.1, supra, requiring reimbursement on the basis of "reasonable costs", stands unamended. The transparency of this argument is apparent for a number of reasons. Even under the pre-Boren standard of reimbursement, i.e. "reasonable cost related basis", a New York regulation refusing to recognize stepped-up capital cost components arising from the lease or sale of nursing home facilities for purposes of reimbursement under the Medicaid program was upheld. *Hempstead General Hospital v. Whalen*, 474 F.Supp. 398 (E.D. N.Y.1979). The court in *Illinois Council For Long Term Care v. Miller*, 503 F.Supp. 1091, 1097 (N.D.Ill.1980), in upholding an Illinois statute severely limiting reimbursement of capital costs under the Medicaid program following sale of a nursing home facility, succinctly observed that "reimbursement of actual capital costs creates an incentive to engage in sham transactions in which the buyer, assured of full capital cost reimbursement from the state, is willing to pay an inflated price for the nursing facility with no corresponding commitment to upgrade the standard of care provided by the facility." While this court neither suggests nor implies that the lease assignments acquired by respondent nursing homes were sham transactions, the

mechanism employed, nevertheless, if lease acquisition costs are recoverable in Medicaid reimbursement rates, will have the effect of driving up costs under the Medicaid program without any "corresponding commitment to upgrade the standard of care provided" by the respective facilities.

The argument tendered by respondent nursing homes, that the "Boren Amendment" standard of reimbursement under the Medicaid program is inapplicable and should not be considered by reason of the unamended status of § 208.152.1, supra, is patently transparent for additional reasons. Authority reposed in the Department of Social Services under § 208.152.1, supra, is admittedly broad, and explainably and justifiably so, by reason of the fact that any plan promulgated thereunder is required under 42 U.S.C. § 1396 to be submitted to the federal government (Secretary of Health and Human Resources) for approval. The controversial plan in question was accordingly submitted and approved. In view of the co-operative nature of the Medicaid program, federal and state laws appertaining thereto are to be collectively viewed as constituting an integrated or comprehensive whole. See generally *Riggs v. Department of Public Health and Welfare,* 483 S.W.2d 769, 771 (Mo.App.1972). Moreover, see *Rinefierd v. Blum,* 66 A.D.2d 351, 412 N.Y.S.2d 526, 528 (N.Y. App.Div.1979), holding that to the extent that state statutes and regulations conflict with the Social Security Act and federal regulations thereunder, the former must yield to the latter.

Respondent nursing homes also contend that the trial court properly reasoned that since only individuals or corporate entities could enter into a "valid participation agreement" with the state under the Medicaid program the term "facility" used in the definition of "new providers", 13 CSR 40–81.081(3)(M), necessarily referred to an individual or corporate operator of a facility rather than the facility itself—ipso facto, an operator of a nursing home who was not participating in the Missouri Medicaid program on July 1, 1981, was a "new provid-

er" even though the facility itself, under a prior operator, was participating in the Missouri Medicaid program on July 1, 1981. In advancing this argument respondent nursing homes place great emphasis on the term "provider" as defined in 13 CSR 40–81.081(3)(F): "Providers. A provider under the Prospective Reimbursement Plan is a facility with a valid participation agreement, in effect on or after October 1, 1981, with the Missouri Department of Social Service for the purpose of providing long-term care services to Title XIX eligible recipients." Respondent nursing homes also make reference to § 198.006(8), RSMo Supp.1983 (Omnibus Nursing Home Act): " 'Health care provider', any person providing health care services or goods to residents and who receives funds in payment for such goods or services under Medicaid."

The fallacy of respondent nursing homes' supportive argument for the syllogism indulged in by the trial court is that it summarily assumes that the term "new providers" merely intended and undertook to modify the term "provider" rather than create a new, separate and independent term to describe *both facilities and operators* who were not participating in the Missouri Medicaid program on July 1, 1981. The approach taken by the Department of Social Services to control operating costs arising from the lease assignment mechanism—by adoption of a sui generis term, to-wit, "new providers" to describe both facilities and operators—accorded with the parameters of its statutory authority. Conjunctively, to fully effectuate the cost-control approach undertaken it was incumbent upon the Department of Social Services to go full circle and define "change of ownership" in terms of transfer of "fee title" as was done in 13 CSR 40–81.081(3)(L).

The only plausible explanation for the judgment and decree rendered by the trial court is that the latter either disagreed or did not consider or recognize the distinction drawn by the Department of Social Services between the lease acquisition mechanism

and transfer of "fee title" arising from the former's proclivity to pyramid specious cost factors in Medicaid per diem reimbursement rates. However occasioned, there is no escape from the fact that the trial court advertently or inadvertently substituted its judgment and philosophy in a policy area peculiarly within the broad repose of authority statutorily vested in the Department of Social Services.

Lastly, respondent nursing homes contend that the net effect of 13 CSR 40–81.081(3)(L), defining "change of ownership", and 13 CSR 40–81.081(3)(M), defining "new providers", precludes prospective entrants into the nursing home industry from entering the field by way of lease arrangements and limits their entry to acquiring contemplated facilities in fee simple absolute. No statutory authority, conclude respondent nursing homes, exists for the Department of Social Services to impose such a limitation. The conclusion drawn by respondent nursing homes is unwarranted for the reason that it fails to differentiate between transfers and rate bases. Individual or corporate entities contemplating entry into the nursing home field involving the Medicaid program continue to have a right to do so either by purchasing a contemplated facility in fee or acquiring a limited term therein under a lease. The cost-containment prospective reimbursement plan promulgated by the Department of Social Services, 13 CSR 40–81.081, although providing for different rate bases, does not, as argued by respondent nursing homes, take away the right to enter the nursing home field and participate in the Medicaid program under a lease arrangement.

Gauged by the obtaining principles set forth in *McKesson, Inc. v. Davis*, supra, this court concludes that the terms "change of ownership" and "new providers", 13 CSR 40–81.081(3)(L) and (M), as defined and construed by appellants, do not represent the promulgation of administrative regulations inconsistent with or beyond the scope of enabling statutory authority, or administrative regulations patently unreasonable or arbitrary in nature. This court, accordingly, further concludes that the judgment of the trial court declaring respondent nursing homes to be "new providers" under 13 CSR 40–81.081, and therefore entitled to have new and increased Medicaid per diem reimbursement rates established, constituted a misapplication of the law within the meaning of *Murphy v. Carron*, supra. In sum, the declaratory judgment rendered by the trial court is reversed.

Reversal of the declaratory judgment ipso facto eliminates any foundation for the injunctive relief granted by the trial court; perforce, reversal of the declaratory judgment necessarily requires reversal of the decree of injunction and renders moot appellants' alternative point regarding mandated guidelines for appellants to comply with regarding new Medicaid per diem reimbursement rates for respondent nursing homes. By the same token, respondent nursing homes' motion to strike appellants' alternative point, which was taken with the case, is hereby denied on grounds of mootness.

Declaratory judgment and decree of injunction reversed and set aside.

All concur.