349 S.W.3d 337 (2008)
BEVERLY ENTERPRISES-MISSOURI INC. d/b/a Glennon Place Nursing Center, et al., Appellant,
Bethesda Long Term Care, Inc., Amicus Curiae,
v.
DEPARTMENT OF SOCIAL SERVICES, DIVISION OF MEDICAL SERVICES, Respondent.
No. WD 69040.
Missouri Court of Appeals, Western District.
December 09, 2008.
Application for Transfer Sustained February 24, 2009.
Case Retransferred October 6, 2009.
Court of Appeals Opinion Re-adopted December 22, 2009.
*340 Mark E. Long and Jeffrey Scott Stacey, Jefferson City, MO, for Respondent.
Richard D. Watters, St. Louis, MO, for Amicus Curiae.
PER CURIAM:
Beverly Enterprises-Missouri, Inc. and Commercial Management, Inc. (Beverly) appeal the judgment of the Cole County Circuit Court declaring valid emergency and proposed amendments to the regulation governing Medicaid reimbursement rates promulgated by the Missouri Department of Social Services, Division of Medical Services (Division).[1] The Division *341 cross-appeals from the judgment of the circuit court reversing the decision of the Administrative Hearing Commission (AHC).[2] The AHC ruled that the Division incorrectly calculated the administration cost component ceiling of the Medicaid per diem reimbursement rates of seventeen nursing facilities operated by Beverly. The judgment of the circuit court is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND
Beverly operates seventeen long-term care nursing facilities in Missouri. These nursing facilities participate in the Missouri Medicaid program. The Division administers the program and has authority to determine Medicaid reimbursement rates for nursing facilities.
Under the Missouri Medicaid program, a nursing facility receives a set daily rate per Medicaid resident. The rule governing Medicaid reimbursement to nursing facilities is the "Prospective Reimbursement Plan for Nursing Facility Services," 13 CSR 70-10.015 (2005).[3] The per diem reimbursement rate is a fixed, prospective rate calculated based on allowable costs in previous years, application of trend factors, and various incentives and adjustments. Each nursing facility submits an annual cost report to the Division. The Division selects a base cost year to establish the facilities' reimbursement rates and maintains a data bank of the audited cost report data for the base year that has been trended for inflation. The allowable costs that are used to determine a facility's reimbursement rate are grouped into four components: patient care, ancillary, administration, and capital. The per diem reimbursement rate is the sum of the individual cost component per diems for the facility plus a working capital allowance and other miscellaneous incentives and adjustments.
The administration and capital cost components, which are fixed regardless of occupancy rate, are subject to a minimum utilization adjustment. Because the Department considers it more efficient and economical for facilities to spread their fixed administration and capital costs over more patients, the adjustment provides lower reimbursement to facilities with an occupancy rate of less than the minimum utilization percentage. Thus, when cost components are adjusted for minimum utilization, a facility's costs are spread over more patient days than the facility actually observed, thereby decreasing the facility's per diem reimbursement rate.
The patient care, ancillary, and administration cost components of a facility are then compared to a ceiling for those components. The facility's per diem rate is the lower of its calculated per diem rate for each of the components or the ceiling for that component.
Thirteen CSR 70-10.015, or the "Reimbursement Plan," became effective on January 1, 1995. The Reimbursement Plan was the result of the work of a task force commissioned by the Governor to recommend a new, better reimbursement plan than the plan in place. The task force started meeting in 1993 and consisted of representatives from several state agencies. The task force analyzed other states' *342 reimbursement systems, considered actual industry experience, and ran various cost scenarios. The task force recommended and the Division adopted an 85% minimum utilization adjustment for the administration and capital cost components in the 1995 version of the Reimbursement Plan because that was the average occupancy rate of Missouri facilities at the time.
During the 2004 legislative session, the General Assembly passed and the Governor approved Senate Bill 1123, which was codified at section 208.225, RSMo Cum. Supp.2004, and became effective on July 1, 2004. Section 208.225 required the Division to recalculate Medicaid per diem reimbursement rates and to set the administration cost ceiling as 110% of the median cost center. Although not required by section 208.225, the Division also changed the minimum utilization adjustment for the capital cost component from 85% to 73% and eliminated the minimum utilization adjustment for the administration cost component. By letters dated July 1 and 13, 2004, the Division notified Beverly's nursing facilities of their new per diem rates for state fiscal year 2005, July 1, 2004, to June 30, 2005.
Prior to March 10, 2005, the Division calculated that the costs of implementing the July 2004 rate increase would be $58.4 million for state fiscal year 2005. However, the General Assembly had appropriated only $42.5 million to fund the July 2004 rate increase. Thus, the Division calculated that approximately $16 million in additional appropriations would be required to make Medicaid payments to nursing facilities for services rendered during state fiscal year 2005 under the current reimbursement plan. The Division brought the anticipated appropriation shortfall to the attention of the General Assembly in June 2004 and to the Governor in October 2004. In late January 2005, the Division learned that its request for approximately $16 million to compensate for the shortfall was not part of the Governor's supplemental appropriations request to the legislature. Without the supplemental appropriation, the Division projected that Medicaid payments to nursing homes would end in May 2005 for state fiscal year 2005. Thus, the Division began looking at different options for emergency rule promulgation to enable it to make payments within the appropriated amount.
The Division reviewed the cost reports submitted by all Missouri Medicaid nursing home providers. It also reviewed the Certificate of Need Program's quarterly surveys and summaries, which track trends in Medicaid nursing facilities, their occupancy, available beds, and Medicaid recipients. The surveys indicated the followingthe number of Missouri Medicaid nursing facilities had remained fairly steady since 2001, the number of available Medicaid beds had increased slightly since 1995, and 51% of Medicaid beds were occupied as of 2005. The Division was also aware of the State Auditor's Report, which concluded that the nursing home industry in Missouri was overbuilt. Finally, the Division met with two nursing home associations in the state, the Missouri Health Care Association (MHCA) and the Missouri Association of Homes for the Aging (MOAHA), to obtain feedback on proposed changes to the Reimbursement Plan.
The Division's goals in amending the Reimbursement Plan were to stay within its appropriation and to avoid affecting the patient care and ancillary cost components, which were most directly related to the cost of patient care. The Division also did not want to pay for empty nursing facility beds. The Division examined various changes to the Plan and the impact that each scenario would have on the nursing facilities. Scenarios examined by the Division *343 included the elimination of trend factors and a pro rata reduction of rates. While those options would have kept Medicaid payments within the appropriation, the Division rejected them because they would have affected the patient care and ancillary cost components. The Division also examined amending the minimum utilization percentages. It considered different combinations of 0, 73, and 85% for the capital and administration cost components and the possibility of pegging the minimum utilization percentages to the current occupancy levels in the state. Based on its analysis of the different scenarios and the Division's experience with an 85% minimum utilization adjustment from 1995 until 2004, the Division ultimately concluded that increasing the minimum utilization percentages of the capital and administration cost components best met its goals.
On or about March 21, 2005, the Division filed an emergency amendment to its nursing home reimbursement regulation, 13 CSR 70-10.015. The March 21 amendment provided that the Medicaid per diem reimbursement rate for nursing facilities would be rebased effective April 1, 2005, through September 27, 2005, using each facility's 2001 cost report. It also amended the regulation to increase the minimum utilization adjustment for the capital cost component from 73% to 85% and the administration cost component from 0% to 85%. By letters dated March 25, 2005, the Division notified Beverly's nursing facilities of their new rates.
On March 29, 2005, the Division filed a proposed amendment to make the changes in the March 21 emergency amendment permanent and to provide for the calculation of rates for state fiscal year 2006. On or about June 20, 2005, the Division issued another emergency amendment for calculation of per diem reimbursement rates effective July 1, 2005, through December 25, 2005. By order of rulemaking published in the Missouri Register on or about August 15, 2005, the Division promulgated the March 29 proposed amendment to 13 CSR 70-10.015 as a final rule with minor changes.
Each of Beverly's facilities filed a complaint with the AHC regarding their new per diem reimbursement rates effective April 1, 2005, arguing, inter alia, that the March 21 emergency amendment, the March 29 proposed amendment adopted by the August 15 order of rulemaking, and the June 20 emergency amendment to 13 CSR 70-10.015 ("challenged amendments") violated federal and state law and that the Division incorrectly calculated the administration cost component.
Following a hearing on the consolidated cases, the AHC issued its decision. It found that it did not have jurisdiction to declare the validity of the challenged amendments and only made findings of fact on the issue. The AHC ruled that the Division incorrectly determined the administration per diem ceiling when it adjusted cost figures for minimum utilization. The AHC ordered the Division to recalculate the rates.
Both Beverly and the Division sought judicial review of the AHC's decision in the Circuit Court of Cole County. Beverly asked the court to declare the challenged amendments invalid for violating federal and state law. The Division asserted that the AHC erred in ordering it to recalculate the administration per diem ceiling. It also claimed that the AHC erred in excluding evidence relative to the issue of the lawfulness of the Division's rulemaking.
The circuit court entered judgment denying Beverly's challenges to the Division's amendments. It also ruled that the Division's calculation of the administration cost component ceiling complied with the plain language of the regulation thereby *344 reversing the AHC's decision ordering it to recalculate the ceiling. This appeal by Beverly and cross-appeal by the Division followed.

BEVERLY'S APPEAL
Beverly raises three points on appeal challenging the validity of the Division's amendments. It contends that the Division's adoption, in the challenged amendments, of the 85% minimum utilization adjustment for capital and administrative cost components was arbitrary, capricious, and unreasonable and was not based on substantial evidence in that the Division did not consider whether its reimbursement rates would cover the costs of efficiently and economically operated nursing home providers or whether the amendments were necessary to carry out the purposes of statute authorizing the amendments. Beverly also contends that the amendments were unlawful because the Division failed to follow the notice and comment procedures to propose rule changes.

Standard of Review
The AHC lacks jurisdiction to rule on the validity of agency regulations. Cocktail Fortune, Inc. v. Supervisor of Liquor Control, 994 S.W.2d 955, 957 (Mo. banc 1999); Psychiatric Healthcare Corp. of Mo. v. Dep't of Soc. Servs., 100 S.W.3d 891, 898 (Mo.App. W.D.2003); Monroe County Nursing Home Dist. v. Dep't of Soc. Servs., Div. of Med. Servs., 884 S.W.2d 291, 293 (Mo.App. E.D.1994). Accordingly, in this case, the AHC only made findings of fact on the issue of the validity of the challenged amendments. Beverly's appeal to the circuit court was effectively an action for declaratory judgment as to the validity of the challenged amendments. The circuit court determined that the Division's amendments were not invalid. This court reviews the circuit court's decision. Cocktail Fortune, 994 S.W.2d at 957.
In a declaratory judgment action, the trial court's judgment will be affirmed on appeal unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Psychiatric Healthcare Corp., 100 S.W.3d at 899; Massage Therapy Training Inst., LLC v. Mo. State Bd. of Therapeutic Massage, 65 S.W.3d 601, 604 (Mo.App. S.D.2002). Questions of law are reviewed de novo without deference to the trial court's conclusions. Psychiatric Healthcare Corp., 100 S.W.3d at 899.

Point I
In its first point, Beverly contends that the Division's adoption in the challenged amendments of an 85% minimum utilization adjustment for the capital and administrative cost components was arbitrary, capricious, and unreasonable because the Division selected the percentage to solve its funding issue and did not consider whether its Medicaid reimbursement rates would cover the costs of efficiently and economically operated nursing home providers as required by section 208.152.8, RSMo Cum.Supp.2007, 13 CSR 70-10.015(3)(O), and its own practices.
Section 536.014, RSMo 2000, concerns the validity of agency rules:
No department, agency, commission or board rule shall be valid in the event that:
(1) There is an absence of statutory authority for the rule or any portion thereof; or
(2) The rule is in conflict with state law; or
(3) The rule is so arbitrary and capricious as to create such substantial *345 inequity as to be unreasonably burdensome on persons affected.
"`Arbitrary and capricious' has been defined in the context of rules and regulations as `willful and unreasoning action, without consideration of and in disregard of the facts and circumstances.'" Psychiatric Healthcare Corp., 100 S.W.3d at 900 (citation omitted). "`An administrative agency acts unreasonably and arbitrarily if its findings are not based on substantial evidence.'" Hundley v. Wenzel, 59 S.W.3d 1, 8 (Mo.App. W.D.2001)(quoting Barry Serv. Agency Co. v. Manning, 891 S.W.2d 882, 892 (Mo.App. W.D.1995)). Furthermore, an agency that completely fails to consider an important aspect or factor of the issue before it may be found to have acted arbitrarily and capriciously. Barry Serv. Agency, 891 S.W.2d at 892 (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.")
Beverly contends that the Division failed to consider whether its rates reimburse the costs of efficiently and economically operated facilities as required by state law, specifically section 208.152.8, RSMo Cum. Supp.2007, and 13 CSR 70-10.015(3)(O). It asserts that because the Division's sole reason for changing the minimum utilization percentage was to solve its funding issue, its decision-making process was arbitrary, capricious, and unreasonable.
Section 208.152.8, RSMo Cum.Supp. 2007, mandates:
Providers of long-term care services shall be reimbursed for their costs in accordance with the provisions of Section 1902(a)(13)(A) of the Social Security Act, 42 U.S.C. § 1396a, as amended, and regulations promulgated thereunder.
The Boren Amendment was previously codified at 42 U.S.C. § 1396a(a)(13)(A) and required states to establish a scheme for reimbursing health care providers for the medical services they provide to Medicaid patients. Mo. Dep't of Soc. Servs., Div. of Med. Servs. v. Great Plains Hosp., Inc., 930 S.W.2d 429, 431 (Mo.App. W.D.1996). Specifically, a state's plan must have provided for the payment of services through the use of rates that "`the state finds, and makes assurances to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities.'" Id. (quoting 42 U.S.C. § 1396(a)(13)(A) (1992)). Forty-two C.F.R. § 447.250 implemented the Boren Amendment:
(a) This subpart implements section 1902(a)(13)(A) of the Act, which requires that the State plan provide for payment for hospital and long-term care facility services through the use of rates that the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities to provide services in conformity with State and Federal laws, regulations, and quality and safety standards.
To comply with the procedural requirement of the Boren Amendment to make findings and assurances as to the reasonableness and adequacy of its Medicaid reimbursement rates, a state was required to conduct an objective analysis, evaluation, or fact-finding process to determine the effects of the rates on the level of care Medicaid patients receive and to judge the *346 reasonableness of its rates against the objective benchmark of an efficiently and economically operated facility. Great Plains, 930 S.W.2d at 433-34.
The Boren Amendment, however, was repealed by the Balanced Budget Act of 1997, Pub.L. No. 105-33, section 4711(a), 111 Stat. 251, 507-08 (1997). The requirement prescribed by the Boren Amendment that states pay "reasonable and adequate" rates was eliminated and replaced with the mandate that states provide "a public process" for determination of rates. Children's Seashore House v. Waldman, 197 F.3d 654 (3rd Cir.1999). "Under the new statute, states must allow `providers, beneficiaries and their representatives, and other concerned State residents' a reasonable opportunity to review and comment on `proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates.'" Children's Hosp. & Med. Ctr. v. Bonta, 97 Cal.App.4th 740, 118 Cal.Rptr.2d 629, 636 (2002)(quoting 42 U.S.C. § 1396a(a)(13)(A)(i) and (ii)).
In repealing the Boren Amendment, Congress sought to increase the flexibility of states in setting Medicaid reimbursement rates by eliminating the basis for causes of actions by providers to challenge reimbursement rates and freeing states from federal regulation. Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs., 424 F.3d 931, 941 (9th Cir.2005); In re NYAHSA Litigation, 318 F.Supp.2d 30, 38-39 (N.D.N.Y.2004). The repeal of the Boren Amendment "empowered states to replace their existing Boren-compliant rate plans with new rate plans not subject to challenge based on the reasonableness and adequacy requirements of the Boren Amendment. Congress was explicit on how this change was to occur; states were to promulgate a rate plan and subject it to the `notice and comment' administrative procedure." Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehabilitative Servs., 225 F.3d 1208, 1217 (11th Cir.2000).
Beverly recognizes that the Boren Amendment has been repealed but asserts that because the implementing regulation still exists, the Division was obligated to make findings and assure that the Medicaid reimbursement rates were reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities. The repeal of the Boren Amendment, however, effectively repealed the regulations implementing the statute. Congress "expressly provided that the standards of the repealed Boren Amendment are not applicable to payments for services rendered after [October 1, 1997]." HCMF Corp. v. Gilmore, 26 F.Supp.2d 873, 879 (W.D.Va.1998)(citing Balanced Budget Act of 1997, Pub.L. No. 105-33, § 4711(a), 111 Stat. 251, 507-08 (1997)). "With the repeal of the Boren Amendment nothing remains that remotely resembles a federal right to reasonable and adequate rates." Id. at 880. Beverly cites no cases where the Boren Amendment provisions were applied to claims for reimbursement after the repeal. Furthermore, it does not contend that the challenged amendments violate the public process requirement of the current 42 U.S.C. § 1396a (Supp.2008). Beverly's arguments under the Boren Amendment and its implementing regulations fail.
Next, Beverly argues that the Division's own regulation, 13 CSR 70-10.015(3)(O), requires it to consider whether its Medicaid rates will reimburse the costs of efficiently and economically operated providers. The regulation reads:
The reimbursement rates authorized by this regulation may be reevaluated at least on an annual basis in light of the provider's cost experience to determine *347 any adjustments needed to assure coverage of cost increases that must be incurred by efficiently and economically operated providers.
13 CSR 70-10.015(3)(O).
The requirement in 13 CSR 70-10.015(3)(O) to assure that reimbursement rates cover the costs that must be incurred by efficiently and economically operated providers reflects the procedural requirements of the repealed Boren Amendment.[4] As discussed above, those requirements no longer exist under federal law, or specifically under 42 U.S.C. § 1396a(a)(13)(A) (Supp.2008).
"'An administrative agency enjoys no more authority than that granted by statute.'" Gee v. Dep't of Soc. Servs., Family Support Div., 207 S.W.3d 715, 719 (Mo.App. W.D.2006) (citation omitted). Accordingly, "`[r]egulations may be promulgated only to the extent of and within the delegated authority of the statute involved.'" Id. (citation omitted). Furthermore, "[i]n view of the co-operative nature of the Medicaid program, federal and state laws appertaining thereto are to be collectively viewed as constituting an integrated or comprehensive whole."[5]AGI-Bloomfield Convalescent Ctr., Inc. v. Toan, 679 S.W.2d 294, 302 (Mo.App. W.D.1984). Thus, "to the extent that state statutes and regulations conflict with the Social Security Act and federal regulations thereunder, the former must yield to the latter." Id.
Section 208.152.8, RSMo Cum. Supp.2007, requires:
Providers of long-term care services shall be reimbursed for their costs in accordance with the provisions of Section 1902(a)(13)(A) of the Social Security Act, 42 U.S.C. § 1396a, as amended, and regulations promulgated thereunder.
The Missouri General Assembly has mandated that providers of long-term care services be reimbursed for their costs in accordance with 42 U.S.C. § 1396a, as amended, "and regulations promulgated thereunder." After repeal of the Boren Amendment, 42 U.S.C. § 1396a prescribes only a public notice process for determination of reimbursement rates. The additional requirement in 13 CSR 70-10.015(3)(O) that the Division assure that its reimbursement rates cover the costs that must be incurred by efficiently and economically operated providers conflicts with the current version of 42 U.S.C. § 1396a (Supp.2008), was not "promulgated thereunder," and exceeds the Division's authority under section 208.152.8. See e.g. Gee, 207 S.W.3d at 718-19(where state statute required Missouri's definition of "institutionalized spouse" for purposes of Medicaid program to mirror federal definition and Department of Social Service's regulation defining term contained additional requirement not contained in federal law, the Department exceeded its statutory authority). Thus, the Division's adoption in the challenged amendments of an 85% minimum utilization adjustment for the capital and administrative cost components was not arbitrary, capricious, and unreasonable for failure to consider whether Medicaid reimbursement rates would cover the costs of efficiently and economically *348 operated nursing home providers. The circuit court did not err in denying Beverly's request to invalidate the amendments. Point one is denied.

Point II
In its second point on appeal, Beverly contends that the Division's adoption in the challenged amendments of an 85% minimum utilization adjustment for the capital and administration cost components violated section 536.016, RSMo 2000. Section 536.016, RSMo 2000, provides:
1. Any state agency shall propose rules based upon substantial evidence on the record and a finding by the agency that the rule is necessary to carry out the purposes of the statute that granted such rulemaking authority.
2. Each state agency shall adopt procedures by which it will determine whether a rule is necessary to carry out the purposes of the statute authorizing the rule. Such criteria and rulemaking shall be based upon reasonably available empirical data and shall include an assessment of the effectiveness and the cost of rules both to the state and to any private or public person or entity affected by such rules.
Subsection 1 of section 536.016 imposes an obligation on an agency to "`propose rules'" that are based on "`substantial evidence'" and are "`necessary to carry out the purposes of the statute granting such rulemaking authority.'" State ex rel. Atmos Energy Corp. v. Pub. Serv. Comm'n of State, 103 S.W.3d 753, 762 (Mo. banc 2003). Subsection 2 mandates that the agency's determination that the rule proposed is necessary to carry out the purposes of the enabling statute must be supported by empirical data and include a cost-benefit analysis.
A regulation is valid unless it is unreasonable and plainly inconsistent with the statute under which it was promulgated. Linton v. Mo. Veterinary Med. Bd., 988 S.W.2d 513, 517 (Mo. banc 1999); Foremost-McKesson, Inc. v. Davis, 488 S.W.2d 193, 197 (Mo. banc 1972). The regulation must bear a reasonable relationship to the legislative objective. Foremost-McKesson, 488 S.W.2d at 197. To show that a regulation exceeds statutory authority, it must be "so at odds with fundamental principles as to be mere whim or caprice." Id. at 200.
Beverly first claims that the Division's selection of an 85% minimum utilization adjustment was not based on substantial evidence. It argues that for the same reason that the challenged amendments were arbitrary, capricious, and unreasonablebecause the Division did not consider whether the reimbursement rates would cover the costs of efficiently and economically operated nursing home providersthe amendments also violated the requirement in section 536.016 that rules be based on substantial evidence. As discussed in point one above, federal law no longer requires such procedure, See Balanced Budget Act of 1997, Pub.L. No. 105-33, § 4711(a), 111 Stat. 251, 507-08 (1997)(repealing the Boren Amendment), and to the extent that 13 CSR 70-10.015(3)(O) requires such, the Division exceeded its statutory authority in promulgating the regulation. See Gee, 207 S.W.3d at 718-19.
Beverly also claims that the Division did not make a finding that the challenged amendments were necessary to carry out the purposes of the statutes that granted the Division's rulemaking authority. Sections 208.153 and 208.201, RSMo Cum.Supp.2007, and section 208.159, RSMo 2000, grant the Division authority to promulgate rules governing Medicaid reimbursement to nursing facilities. Specifically, section 208.201.6(2), RSMo Cum. Supp.2007, provides, the Division shall *349 have the power "[t]o adopt, amend and rescind such rules and regulations necessary or desirable to perform its duties under state law and not inconsistent with the constitution or laws of this state." Likewise, section 208.153.1, RSMo Cum. Supp.2007, provides, in pertinent part, "[T]he [Division] shall by rule and regulation define the reasonable costs, manner, extent, quantity, quality, charges and fees of [Division] benefits herein provided." Finally, section 208.159, RSMo 2000, provides, in pertinent part:
[T]he department of social services shall administer payments for nursing home services authorized in section 208.151, et seq., which govern Title XIX, Public Law 89-97, 1965 amendments to the Federal Social Security Act . . . [and] shall, pursuant to chapter 536, RSMo, promulgate rules and regulations for the purpose of administering such payments, including rules to define the reasonable costs, manner, extent, quality, charges and fees or payments for nursing home services.
These statutes unquestionably grant the Division the power to establish reasonable costs for nursing home services as a basis for setting the per diem reimbursement rates. Westview Health Care Ass'n v. Mo. Dep't of Soc. Servs., Div. of Med. Servs., 851 S.W.2d 111, 113 (Mo.App. W.D. 1993)(where the power under sections 208.159 and 208.201 to promulgate rules to establish reasonable costs included the power to promulgate a regulation providing a method for establishing a reasonable capital cost for nursing homes). The Division's goals in amending the Reimbursement Plan in 2005 were to stay within its appropriation without affecting the patient care and ancillary cost components, which were most directly related to the cost of patient care. The Division also did not want to pay for empty nursing facility beds. Spreading facilities' fixed administration and capital costs over more patients is a more efficient and economical use of Medicaid reimbursement. To encourage such efficiency, the minimum utilization adjustment provides lower reimbursement to facilities with an occupancy rate of less than minimum utilization percentage. The Division's adoption of an 85% minimum utilization adjustment for capital and administration cost components was reasonable and consistent with the legislative objective to establish reasonable costs of Medicaid services as a basis for setting reimbursement rates. The challenged amendments were necessary to carry out the purposes of sections 208.153, 208.159, and 208.201. The Division "responded in a manner consistent with both its statutory authority and a sense of fiscal responsibility." AGI, 679 S.W.2d at 301.
Furthermore, the adoption of the 85% minimum utilization adjustment was based upon reasonably available empirical data including a cost-benefit analysis. Faced with a looming budgetary shortfall, the Division reviewed the cost reports submitted by nursing facilities, considered data from the Certificate of Need program regarding occupancy rates, and consulted with nursing home organizations about possible rate changes. It also relied upon its own previous nine-year experience with an 85% minimum utilization adjustment. The Division then examined various changes to the Reimbursement Plan and the impact that each scenario would have on the State and the nursing homes. The Division's adoption in the challenged amendments of an 85% minimum utilization adjustment for capital and administration cost components did not violate section 536.016. The point is denied.

Point III
In its third point on appeal, Beverly claims that the challenged amendments *350 were unlawful because the Division failed to follow the notice and comment procedures in sections 536.021, RSMo. Cum.Supp.2007, and section 536.025, RSMo 2000, to propose rule changes. Specifically, it asserts that no immediate danger or compelling government interest existed to justify the Division's use of emergency rulemaking procedures.
Promulgation of a rule or regulation requires compliance with the rulemaking procedures of section 536.021. NME Hosps., Inc. v. Dep't of Soc. Servs., Div. of Med. Servs., 850 S.W.2d 71, 74 (Mo. banc 1993). The statute sets forth notice and comment procedures for proposing, adopting, amending, or rescinding a rule or regulation. Id. "The purpose of the notice and comment procedures is to provide information to the agency through statements of those in support of or in opposition to the proposed rule." Id. A rule or regulation adopted in violation of section 536.021 is void. Id.; § 536.021.7.
An agency may promulgate, amend, or rescind a rule or regulation without following the notice and comment requirements of section 536.021 only if the agency:
(1) Finds that an immediate danger to the public health, safety or welfare requires emergency action or the rule is necessary to preserve a compelling governmental interest that requires an early effective date as permitted pursuant to this section;
(2) Follows procedures best calculated to assure fairness to all interested persons and parties under the circumstances;
(3) Follows procedures which comply with the protections extended by the Missouri and United States Constitutions; and
(4) Limits the scope of such rule to the circumstances creating an emergency and requiring emergency action.
§ 536.025.1. The specific facts, reasons, and findings that support the agency's compliance with the requirements of subsection 1 must be included in a written statement filed with the Secretary of State. § 536.025.2.
Beverly's sole contention in this point is that the Division failed to comply with the first requirement of subsection 536.025.1 because no immediate danger or compelling government interest existed. It claims that the alleged budget shortfall was not an emergency and that any danger posed by a shortfall was not immediate.
The emergency statements for the March 21 and June 20 amendments explained that for fiscal year 2005, the state's budget included $42.5 million to fund the increases required by the General Assembly in section 208.225 but that the actual costs of such increases was $58.4 million and that for fiscal year 2006, the appropriation by the General Assembly did not include any funds for any per diem rate increases. Such amendments were, therefore, necessary to secure a sustainable Medicaid program and to ensure that payments for nursing facility per diem rates are in line with the funds appropriated for that purpose. The statements further explained that the amendments "must be implemented on a timely basis to ensure that quality nursing facility services continue to be provided to Medicaid patients in nursing facilities" to the end of state fiscal year 2005 and for state fiscal year 2006.
"The purpose of the Medicaid program is to provide medical assistance to needy persons whose income and resources are insufficient to meet the expenses of health care." Rolla Manor, Inc. v. Mo. Dep't of Soc. Servs., Div. of Med. Servs., 865 S.W.2d 812, 814-15 (Mo.App. *351 S.D.1993). By participating in the joint federal-state Medicaid program, Missouri obligated itself to provide care for nursing facility patients and, thus, had a compelling governmental interest to ensure that Missouri citizens would be cared for through the end of the state fiscal year. Id. at 815-16.
In providing Medicaid services to Missourians under its prospective reimbursement plan, the state endeavors to provide reasonable reimbursement to participating providers while incorporating cost containment measures. Id. at 815. In this case, if the Division had not promulgated the emergency amendments, the expenses of the nursing facility program would have exceeded by $16 million the funds appropriated by the legislature to pay for the program. The program would have run out of money before the end of the fiscal year, and the Division would have been unable to pay nursing facilities in the state. Evidence presented showed that if the Division could not pay the nursing facilities, patient care could have been compromised because nursing facilities rely on Medicaid payments to meet certain expenses, such as payroll. An emergency existed in this case for purposes of rulemaking.
Beverly also asserts that any danger was not immediate because the Division knew about the anticipated shortfall nine months before issuance of the emergency amendments and, therefore, had ample time to engage in normal notice and comment rulemaking. The evidence showed, however, that the Division learned that it would not receive a supplemental appropriation to compensate for the shortfall in late January or February 2005, only two months before the effective date of its first emergency amendment. The danger posed by the budget shortfall was immediate. The Division complied with the requirement of section 536.025.1(1) for emergency rulemaking. The point is denied.

DIVISION'S CROSS APPEAL
The Division raises two points on appeal. First, it asserts that the AHC erred in ruling that it incorrectly determined the administration cost component ceiling when it adjusted cost figures for minimum utilization and in ordering it to recalculate the ceiling. The Division's second point challenges the AHC's exclusion of evidence and its offer of proof regarding Beverly's failure to establish a Boren Amendment violation.

Standard of Review
The appellate court reviews the decision of the AHC, not the circuit court. Psychiatric Healthcare Corp., 100 S.W.3d at 899. The AHC's decision will be upheld unless it is not supported by competent and substantial evidence upon the whole record; it is arbitrary, capricious, or unreasonable; it is an abuse of discretion; or it is otherwise unauthorized by law or in violation of constitutional provisions. Dep't of Soc. Servs., Div. of Med. Servs. v. Little Hills Healthcare, L.L.C., 236 S.W.3d 637, 641 (Mo. banc 2007); Psychiatric Healthcare Corp., 100 S.W.3d at 899. "Questions of law are reviewed de novo." Little Hills Healthcare, 236 S.W.3d at 641.

Point I
In the first point in its cross appeal, the Division contends that the AHC erred in ruling that it incorrectly calculated the administration cost component ceiling in 13 CSR 70-10.015 when it adjusted cost figures for minimum utilization and in ordering it to recalculate the ceiling. The Division argues that the AHC interpreted the regulation contrary to its plain language and the intent of the drafters and applied the wrong standard of review.
*352 Regulations are interpreted under the same principles of construction as statutes. Dep't of Soc. Servs., Div. of Med. Servs. v. Senior Citizens Nursing Home Dist. of Ray Co., 224 S.W.3d 1, 10 (Mo.App. W.D.2007). The "goal is to ascertain the intent from the language used and to give effect to that intent if possible." Id. Words are given their plain and ordinary meaning. Id. Particular provisions or subsections of a regulation shall not be read in isolation but examined in light of the entire regulation and, if possible, harmonized with that regulation. Gash v. Lafayette County, 245 S.W.3d 229, 232 (Mo. banc 2008); Frene Valley Corp. v. Dep't of Soc. Servs., Div. of Med. Servs., 926 S.W.2d 144, 146 (Mo.App. E.D.1996). All of the language contained in the regulation must be given effect; none shall be disregarded. Frene Valley, 926 S.W.2d at 146. "The interpretation and construction of a statute by an agency charged with its administration is entitled to great weight." Foremost-McKesson, 488 S.W.2d at 197. However, it is inappropriate to defer to an agency's interpretation of its own regulation that in any way expanded upon, narrowed, or was otherwise inconsistent with the plain and ordinary meaning of the words used in the regulation. Senior Citizens, 224 S.W.3d at 15.
Thirteen CSR 70-10.015(11)(C) (2005) provides for the calculation of a nursing facility's administration cost component per diem:
(C) Administration. Each nursing facility's administration per diem shall be the lower of
1. Allowable cost per patient day for administration as determined by the division from the 1992 cost report, trended by the HCFA Market Basket Index for 1993 of 3.9%, 1994 of 3.4% and nine months of 1995 of 3.3%, for a total of 10.6% and adjusted for minimum utilization, if applicable, as described in subsection (7)(O); or
2. The per diem ceiling of one hundred ten percent (110%) of the administration median determined by the division from the data bank.
Under section (11)(C), a nursing facility's administration per diem is calculated from the cost reports submitted by the facility then adjusted for minimum utilization. The calculated per diem is then compared to the administration per diem ceiling. The facility's administration per diem is the lower of the calculated per diem rate for the facility or the ceiling. 13 CSR 70-10.015(11)(C). The dispute here involves the calculation of the ceiling.
Thirteen CSR 70-10.015(4)(L) defines "Ceiling" as:
The ceiling is determined by applying a percentage to the median per diem for the patient care, ancillary and administration cost components. The percentage is one hundred twenty percent (120%) for patient care, one hundred twenty percent (120%) for ancillary and one hundred ten percent (110%) for administration.
"Median" is defined by the regulation as: "The middle value in a distribution, above and below which lie an equal number of values. This distribution is based on the data bank." 13 CSR 70-10.015(4)(KK). "Per diem" is "[t]he daily rate calculated using this regulation's cost components and used in determination of a facility's prospective and/or interim rate." 13 CSR 70-10.015(4)(PP). Finally, "data bank" is defined as:
The data from the desk audited and/or field audited 1992 cost report excluding hospital based, state operated and pediatric nursing facilities. This data is adjusted for the HCFA Market Basket Index for 1993 of 3.9%, 1994 of 3.4% and *353 nine months of 1995 of 3.3%, for a total adjustment of 10.6%.
13 CSR 70-10.015(4)(S).
In this case, the Division calculated the administration cost component ceiling by first calculating the administration per diem for each nursing facility. It then adjusted the per diem for minimum utilization. Next, it determined the medianthe middle value of all of the nursing facility administration per diems that it calculated. The median was $19.45. Finally, the Division calculated the ceiling by multiplying the median, $19.45, by 110%. The ceiling was $21.40. The Division compared the ceiling of $21.40 with the administration per diem calculated for each facility and used the lesser value in determining each facility's Medicaid reimbursement rate.
The AHC found that the Division, in calculating the ceiling, improperly selected the median from the nursing facility administration per diems adjusted for minimum utilization rather than from raw cost data in the data bank. In making such finding, the AHC explained that only section 11(C)1 explicitly mandated a minimum utilization adjustment and that such adjustment was not required in calculating the ceiling under section 11(C)2 or under the definitions of median in section 4(KK) or data bank in section 4(S).
The AHC, however, read all of the relevant sections in isolation. Reading each section in light of the entire regulation and giving effect to all of the language contained in the regulation, the median is determined from the nursing facility administration per diems adjusted for minimum utilization rather than from raw cost data. Section 4(L) requires that the ceiling be determined by applying a percentage to the administration cost component "median per diem." The administration per diem for nursing facilities is calculated under section 11(C)1 and includes an adjustment for minimum utilization. The median per diem is then the middle value of the distribution of administration per diems. No evidence was presented that the Division calculated the per diems or the ceiling with any data other than that from the data bank. The Division's calculation of the administration per diem ceiling complied with the plain language of 13 CSR 70-10.015. The AHC erred in ruling that the Division incorrectly calculated the ceiling and in ordering it to recalculate it.

Point II
In its second point in the cross-appeal, the Division contends that the AHC erred in excluding evidence and the Division's offer of proof regarding Beverly's failure to establish a Boren Amendment violation. The Division raises point two only in the event that the Boren Amendment applies in this case. Because the Boren Amendment does not apply herein as discussed in point one of Beverly's appeal, the Division's second point is not addressed.

CONCLUSION
The circuit court did not err in denying Beverly's request to invalidate the challenged amendments. Thus, its judgment declaring valid the challenged amendments is affirmed.
The AHC erred in ruling that the Division incorrectly calculated the administration cost component ceiling in 13 CSR 70-10.015 and in ordering it to recalculate the ceiling. Accordingly, the judgment of the circuit court reversing the decision of the AHC regarding the Division's calculation of the ceiling is affirmed.
MITCHELL, J., recused.
NOTES
[1] The Missouri Division of Medical Services is now known as the MO HealthNet Division.
[2] Under Rule 84.05(e), the party aggrieved by the agency decision files the appellant's brief and reply brief. Both parties agreed that they were both aggrieved by the AHC's decision. Accordingly, the parties effectively briefed the case as a cross-appeal.
[3] All references to the Code of State Regulations (CSR) are to the 2005 edition unless otherwise specified.
[4] See HCMF Corp., 26 F.Supp.2d at 878-80(where state of Virginia did not amend its Medicaid reimbursement plan after the repeal of the Boren Amendment, the standard governing its future reimbursement obligations is a state standard only).
[5] Under 42 U.S.C. § 1396, state Medicaid plans must be submitted to the federal government for review and approval as a condition to receiving federal Medicaid payments. Pharmaceutical Research & Mfrs. Am. v. Thompson, 362 F.3d 817, 822 (D.C.Cir.2004); AGI, 679 S.W.2d at 302.